550 S.E.2d 287

SEA PINES ASSOCIATION FOR THE PROTECTION OF WILDLIFE, INC., Advocates Working for Animals and Respect for the Environment a/k/a AWARE, The Fund for Animals, Inc., Animal Protection Institute, and the Humane Society for the Prevention of Cruelty to Animals, Appellants,

v.

SOUTH CAROLINA DEPARTMENT OF NATURAL RESOURCES AND COMMUNITY SERVICES ASSOCIATES, INC., Respondents.

No. 25326.

Supreme Court of South Carolina.

Heard June 8, 2000.

Decided July 23, 2001.

Rehearing Denied Aug. 22, 2001.

596

Harold W. Jacobs and J. Michelle Childs, both of Nexsen Pruet Jacobs & Pollard, LLP, of Columbia, for appellants.

Ester Haymond and James A. Quinn, of Columbia, for respondent South Carolina Department of Natural Resources; Stephen A. Spitz, of Columbia, and Roberts Vaux and Gray B. Taylor, of Vaux & Marscher, P.A., of Bluffton, all for respondent Community Services Associates, Inc.

TOAL, Chief Justice:

Sea Pines Association for the Protection of Wildlife, Inc., Advocates Working for Animals and Respect for the Environment ("AWARE"), the Fund for Animals, Inc., Animal Protection Institute, and the Humane Society for the Prevention of

Cruelty to Animals ("Appellants") challenge the South Carolina Department of Natural Resources' ("Department") issuance of permits to lethally eliminate a substantial number of white-tailed deer in the Sea Pines Public Service District ("Sea Pines") on Hilton Head Island.

## FACTS/PROCEDURAL BACKGROUND

Sea Pines is a 5,280 acre private, suburban community located on the southern portion of Hilton Head Island, South Carolina. The South Carolina General Assembly established Sea Pines as one of eleven wildlife sanctuaries designated under S.C.Code Ann. § 50–11–880(1) (Supp.2000). Sea Pines provides habitat for numerous species of wildlife, including the white-tailed deer.

Many Sea Pines residents enjoy observing, interacting, and photographing the deer and other wildlife in the sanctuary. However, over the past several years, many residents and homeowners have become concerned with the growing number of deer. Residents of Sea Pines have complained about landscape damage, increased number of automobile collisions [1], and more frequent confrontations between deer and humans. In response, Community Service Associates, Inc. ("CSA") [2] embarked on a program designed to study the deer population. CSA hired both Todd Ballentine, a local naturalist, and also Dr. Robert Warren, a professor of Wildlife Ecology and Management at the University of Georgia School of Forest Resources, to conduct a study of the deer population problem.

Dr. Warren conducted an in-depth scientific analysis of the deer herd in Sea Pines. In conjunction with Dr. Warren's studies, six public meetings were held, the residents were surveyed, and two Master's theses were written. At the conclusion of his research, Dr. Warren issued a comprehensive

---

1. Mr. William Bloom, a statistician with the South Carolina Department of Public Safety, concluded that motorists within Sea Pines were 6.5 times more likely to have a deer/vehicle collision than motorists in South Carolina generally.

2. CSA is an association of property owners in Sea Pines formed to hold and manage the common property in Sea Pines and to provide security. All Sea Pines property owners are mandatory, dues-paying members of CSA.

report and a Project Proposal on May 14, 1998, which served as a basis for the issuance of the permits in this case. Pursuant to the Project Proposal, a scientific study would commence in July 1998, and continue into the year 2000. At the conclusion of the study, lethal techniques would be used to remove 100 to 200 deer, or approximately fifty percent of the herd, in the southern portion of Sea Pines where the concentration of deer was the greatest.

Appellants oppose the lethal reduction of the population of white-tailed deer. The lead Appellant, Sea Pines Association for the Protection of Wildlife, Inc. ("SPAPW"), an organization of Sea Pines residents or property owners, was formed for the specific purpose of promoting the use of non-lethal means of resolving conflicts between humans and wildlife. On August 25, 1998, Appellants filed a Summons and Complaint seeking: (1) a temporary retraining order to restrain the Department from issuing any further permits for the taking or killing of deer within Sea Pines and to restrain CSA and the University of Georgia from acting on any existing permits; (2) a temporary injunction and permanent injunction against the issuance of permits by the Department to CSA without meeting the requirements of section 50–11–880; and (3) a declaratory judgment determining whether the Department complied with the requisite statutes, rules, and regulations relative to the issuance of permits in a wildlife sanctuary, and whether the Department violated the constitutional rights of the residents of Sea Pines by failing to afford them due process.

On September 10, 1998, the trial court denied Appellant's Motion for a Temporary Injunction. Appellants then filed a Petition for a Writ of Supersedeas with the South Carolina Court of Appeals. In a panel hearing on September 23, 1998, the Court of Appeals granted Appellant's petition, which reinstated the temporary restraining order until the trial of the case. On November 20, 1998, the Court of Appeals issued an order holding the appeal in abeyance pending the outcome of a trial on the merits of the case.

A non-jury trial was held from March 15, 1999 to March 17, 1999, where the trial judge vacated the temporary injunction and dismissed the action with prejudice, holding: (1) Appellants lacked standing to pursue the matters alleged in the

Complaint; (2) there are no statutory or constitutional due process requirements for notice or opportunity to be heard concerning the issuance of the permits; and (3) the actions of the Department in the issuance of these permits has been in total compliance with the statutory laws of this State.

On March 10, 1999, the Department issued a permit to CSA and the University of Georgia to collect up to ten male white-tailed deer for a herd health check. On July 13, 1999, the Department issued a permit to CSA and the University of Georgia for the removal of up to one hundred deer in Sea Pines during the period between September 15, 1999 and January 1, 1999. Appellants filed a Petition for a Writ of Supersedeas with the trial court to prevent CSA or any of its agents from acting on the latter permit, which was denied. Appellants filed another Writ of Supersedeas with the Court of Appeals challenging the latter permit, which was granted by order dated September 3, 1999.

On November 24, 1999, CSA file a Motion for Emergency Protection of the Public Health and Safety of Sea Pines Residents and Visitors. The Court of Appeals issued an order denying the Motion, but it noted the stayed permit expired on January 1, 2000, and there was nothing to prevent CSA from requesting another permit. The Department issued a permit to CSA to remove up to two hundred deer from Sea Pines on January 11, 2000. Appellants filed a separate suit on January 13, 2000, and requested a temporary restraining order that the trial court denied. The Court of Appeals issued an oral Writ of Supersedeas in this matter.

On March 13, 2000, this Court granted Appellant's Motion to Certify Case for Review. The following issues are before this Court on appeal:

I. Do Appellants have standing to challenge the Department's issuance of permits for the lethal elimination of deer in the Sea Pines' wildlife sanctuary?

II. Do Appellants, and other affected persons or organizations, have a right to notice and an opportunity to be heard prior to the Department's issuance of permits for the lethal elimination of deer in the Sea Pines' wildlife sanctuary?

III. Did the Department properly issue permits for the lethal elimination of deer in the Sea Pines' wildlife sanctuary by making proper factual and legal determinations under section 50–11–880 that the deer, due to size, disease, or other extraordinary factors, posed a threat to the health, safety, and welfare of the public, or to itself, or other species in or around the sanctuary?

IV. Did the Department properly issue permits under section 50–11–1050 and section 50–11–1090 for the taking of deer in a wildlife sanctuary?

### LAW/ANALYSIS

## I. Standing

Appellants argue the trial court erroneously determined they do not have standing. The trial court reasoned that because the deer are the property of the State of South Carolina and not its individual residents, Appellants do not have standing because they cannot allege a particularized harm as a result of the deer's termination. We agree with the trial court's ruling.

 To have standing, one must have a personal stake in the subject matter of the lawsuit. In other words, one must be a real party in interest. *Charleston County Sch. Dist. v. Charleston County Election Comm'n,* 336 S.C. 174, 519 S.E.2d 567 (1999). "A real party in interest is one who has a real, material, or substantial interest in the subject matter of the action, as opposed to one who has only a nominal or technical interest in the action." *Id.* at 181, 519 S.E.2d at 571 (quoting *Anchor Point, Inc. v. Shoals Sewer Co.,* 308 S.C. 422, 428, 418 S.E.2d 546, 549 (1992)). A private person does not have standing unless he has sustained, or is in immediate danger of sustaining, prejudice from an executive or legislative action. *Baird v. Charleston County,* 333 S.C. 519, 511 S.E.2d 69 (1999). Such imminent prejudice must be of a personal nature to the party laying claim to standing and not merely of general interest common to all members of the public. *Id.* (citing *Citizens for Lee County, Inc. v. Lee County,* 308 S.C. 23, 416 S.E.2d 641 (1992)). When an organization is involved, the organization has standing on behalf of its members if one

or more of its members will suffer an individual injury by virtue of the contested act. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

■ In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the United States Supreme Court enunciated a stringent standing test. *Lujan* set forth the "irreducible constitutional minimum of standing," which consists of the following three elements:

> First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical'. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'

*Id.* at 559–61, 112 S.Ct. at 2136 (internal citations omitted); *see also Beaufort Realty Co. v. S.C. Coastal Conservation League*, 346 S.C. 298, 551 S.E.2d 588 (S.C. Ct.App. 2001). The party seeking to establish standing carries the burden of demonstrating each of the three elements. *Id.* at 561, 112 S.Ct. at 2136–37.

■ The first element requires the plaintiff to suffer an injury in fact, or a particularized harm. The Department argues that an aesthetic interest in wildlife is not a legally protected interest because under South Carolina law there is no protected interest in an individual wild animal, until that animal is reduced to possession. S.C.Code Ann. § 50–11–10 (Supp.2000) ("All wild birds, wild game, and fish, ... are the property of the State."). According to the United States Supreme Court, "The desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for the purpose of standing." *Id.* at 562, 112 S.Ct. at 2137.[3] Furthermore, South Carolina case law has

---

**3.** *See also Sierra Club, supra* ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life

specifically recognized an injury to one's aesthetic and recreational interests in enjoying and observing wildlife is a judicially cognizable injury in fact. *See S.C. Wildlife Fed'n v. S.C. Coastal Council*, 296 S.C. 187, 371 S.E.2d 521 (1988) (holding environmental groups and League of Women Voters had standing because they suffered injuries as a result of decisions by the Coastal Council which affected the members' use and enjoyment of the fish and wildlife of the wetlands); *Ogburn–Matthews v. Loblolly Partners (Ricefields Subdivision)*, 332 S.C. 551, 505 S.E.2d 598 (Ct.App.1998) (holding property owners adjacent to wetlands had standing to challenge the issuance of a permit to fill the wetlands because the permit would adversely affect the property owners' use and enjoyment of the wetlands).

■ Nonetheless, according to *Lujan*, the Appellant's injury has to be actual or imminent, not conjectural or hypothetical. In order for the injury to be "particularized," it must affect the plaintiff in a personal and individual way. *Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136; *see also Beaufort Realty*, *supra* (finding one must suffer an actual injury in fact, not a prospective concern of future harm, in order to satisfy the *Lujan* test). Appellants presented no evidence their opportunity to view and enjoy the deer would be diminished by the permits. The Appellant's injury is conjectural because it is not certain that reducing the size of the herd would decrease the number of deer actually viewed by the residents each day. Because deer population growth has remained constant on Sea Pines, the deer population decrease proposed by the Department may have little or no effect on the residents' ability to enjoy the deer.

Even if we assume Appellants have alleged a particularized harm, Appellants failed to present evidence the injury would be redressed by a favorable decision in this case. As the trial judge noted in his order, the goal of the Appellant's plan was

---

in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."); *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (holding plaintiffs alleged a sufficient injury in fact because whale watching and studying of their members will be adversely affected by continued whale harvesting).

to reduce the size of the deer herd. According to Gordon Stamler, the lead Appellant, their plan was to first use all necessary non-lethal means to reduce the deer population, including educational pamphlets, education of wildlife officers, using roadside reflectors, enforcing the speed limits, and electric fencing. If, after using these non-lethal means, the Department determines pursuant to section 50–11–880 that the deer herd needs to be reduced due to health or safety concerns, the Department would use immunocontraception, a form of birth control. Therefore, it is unlikely that the alleged injury would be redressed by a favorable decision in this case because the Appellant's immunocontraception plan would cause the same injury—a reduction in the population of deer in Sea Pines.

In conclusion, although Appellants have an aesthetic interest in Sea Pines' deer and the environment, they are denied standing because they failed to satisfy the three-pronged *Lujan* test. Because we find Appellants lack standing, we decline to address the due process issue.

## II. The Permits

Appellants argue the trial court erred in determining the Department complied with section 50–11–880 when it issued permits to kill deer in Sea Pines based on the presence of disease, overpopulation, and the number of deer/vehicle collisions. Appellants also argue the trial court erred in determining the Department may issue permits for the taking and killing of animals in a wildlife sanctuary under S.C.Code Ann. § 50–11–1050 and S.C.Code Ann. § 50–11–1090. We disagree.

This Court reviews the Department's permitting decisions pursuant to the standard articulated in the Administrative Procedures Act ("APA"). The findings of an administrative agency are presumed correct and will be set aside only if unsupported by substantial evidence. *Kearse v. State Health & Human Servs. Fin. Comm'n*, 318 S.C. 198, 456 S.E.2d 892 (1995). Under the substantial evidence rule, a reviewing court will not overturn a finding of fact by an administrative agency "unless there is no reasonable probability that the facts could be as related by a witness upon whose

testimony the finding was based." *Lark v. Bi–Lo, Inc.,* 276 S.C. 130, 276 S.E.2d 304 (1981) (citations omitted). Thus, a court may not substitute its judgment for that of an agency as to the weight of the evidence on questions of fact, unless the agency's finding are clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. *Rodney v. Michelin Tire Corp.,* 320 S.C. 515, 466 S.E.2d 357 (1996). Substantial evidence is evidence which would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action. *See Miller by Miller v. State Roofing Co.,* 312 S.C. 452, 441 S.E.2d 323 (1994).

In section 50–11–880, the General Assembly designated eleven specific areas of the state as wildlife sanctuaries and provided that, within these areas, it is unlawful to "attempt to take or kill any wildlife." S.C.Code Ann. § 50–11–880 (Supp. 2000). The statute further directs the Department to monitor these sanctuaries and assigns to the agency the following discretionary rights:

> *If the department determines that, due to size, disease, or other extraordinary factors,* a particular population of a species located in, on, or around a sanctuary described above *constitutes a threat to the health, safety, and welfare of the public or to itself,* or other species in, on, or around the sanctuary, *it may authorize the taking of a sufficient number of species to reduce or eliminate the threat.* The wildlife must be taken by department personnel or other persons acting under their supervision and the authorization for the taking limits the number of animals taken and the days, times, and methods to be used.

S.C.Code Ann. § 50–11–880 (emphasis added).

▆▆▆ We find the Department did not act *ultra vires* when it issued the permits in this case because there is substantial evidence in the record to support the Department's determination that the increase in the size of the deer population, the increase in deer/vehicle collisions, and the potential spread of

*Ehrlichiosis* [4] by the deer [5] constitutes a threat to the health, safety, and welfare of the public.

To refute the evidence presented by the Department, the Appellants relied on the testimony of their expert, Dr. Allen Rutberg, a senior scientist with the Humane Society of the United States. Dr. Rutberg testified that the deer population of Sea Pines was healthy and there is "no evidence . . . that the size of the deer population is in any way a threat to the deer." He also testified that he saw no justification for using lethal means to eliminate the deer at this time. However, he admitted he saw no evidence on the issue of deer population growth. He stated "I've seen no evidence at all that the population of deer at Sea Pines is growing or not growing." Dr. Rutberg's testimony does not discredit the findings of the Department because the health of the deer has nothing to do with the fact the deer population is growing at a rapid rate, dramatically increasing the number of deer/vehicle collisions in Sea Pines.

Between May 1998 and March 1999, the deer herd on Sea Pines increased by one hundred animals, from five hundred to six hundred. As set forth in the accident reports compiled by CSA security, there were 43 reported collisions in 1998, 29 in 1997, 39 in 1996, 33 in 1995, 40 in 1994, and 18 in 1993. Thus, the average of reported deer/vehicle collisions from 1993 to 1998 is 33.6 collisions per year. Charles Ray Ruth, the statewide deer project supervisor for the Department, stated that the deer/vehicle collision rate in Sea Pines is eight times the rate in the remainder of the State.[6] According to Mr. Ruth, the size of the deer population poses a health threat to

---

**4.** *Ehrlichiosis* is a bacterial disease spread by infected ticks. Most infections are mild and can be treated with antibiotics. Severely ill patients can develop abnormally low numbers of white blood cells, abnormally low numbers of platelets, or kidney failure. The risk of severe illness and complications is highest in the elderly.

**5.** Dr. Warren testified that the deer herd on Sea Pines may pose a threat to the public because the herd health surveys show that there is a very high incidence of *Ehrlichiosis*. He states that the fatality rates for both types of *Ehrlichiosis* infections in humans is relative high, especially in elderly people. Dr. Warren would not agree that there is no unique health risk associated with *Ehrlichiosis* because one hundred percent of the deer he examined had been exposed to *Ehrlichiosis*.

**6.** It is unclear whether this is the accurate rate of deer/vehicle collisions. In other sections of the record and in the briefs, the deer/vehicle collision rate is quoted as 6, 6.5, and 7 times greater on Sea Pines than in other parts of South Carolina.

other deer and to the public through increased vehicle collisions. Mr. Ruth's testimony and the other evidence of deer/vehicle collisions on Sea Pines provides substantial evidence to support the Department's holding that the size of the deer population poses a definite threat to the health and safety of Sea Pines' residents.

■ Appellants also contend the Department has improperly issued permits for the taking of deer in Sea Pines under the auspices of statutes other than section 50–11–880. Specifically, the Appellants argue that sections 50–11–1050, 1090, and 1180 do not give the Department the authority to issue permits for the taking of deer in a wildlife sanctuary. However, wildlife sanctuaries are not specifically excluded from these statutes. Furthermore, section 50–11–880 is not a permitting statute. Once the Department makes a determination under section 50–11–880, another statute must be applied to issue the permits. Mr. Ruth, the Department's statewide deer project supervisor, was aware of the specific differences between the various sections, he explained during his testimony the basis and justification for each permit issued, and why he issued each permit pursuant to only certain code sections.

## CONCLUSION

Based on the foregoing, we **AFFIRM** the trial court's order as modified, holding the Appellants do not have standing under *Lujan*, and the Department's issuance of permits for the lethal elimination of deer on Sea Pines was in compliance with the laws of this State.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.