632 S.E.2d 864

CHARLESTON TRIDENT HOME BUILDERS, INC., Appellant,

v.

TOWN COUNCIL OF TOWN OF SUMMERVILLE
and Town of Summerville, Respondents.

No. 26181.

Supreme Court of South Carolina.

Heard March 21, 2006.
Decided July 10, 2006.

Stephen P. Groves, Sr., R. Bruce Wallace, and Jeffrey S. Tibbals, of Nexsen Pruet, LLC, of Charleston, for appellant.

William H. Davidson, II, and Kenneth P. Woodington, of Davidson, Morrison & Lindemann, P.A., of Columbia, for respondents.

Justice MOORE:

Appellant Charleston Trident Home Builders, Inc. (Trident) is a non-profit corporation whose members construct homes, and own and develop property within the town limits of respondent Town of Summerville (Town). Trident commenced this action challenging Town's development impact fee ordinance which was enacted in 2003 pursuant to the South Carolina Development Impact Fee Act, S.C.Code Ann. § 6–1–910 *et seq.* (2004) (the Act). We affirm.

## FACTS

The Act defines a development impact fee as "a payment of money imposed as a condition of development approval to pay a proportionate share of the cost of system improvements needed to serve the people utilizing the improvements." § 6–1–920(8). The Act requires that the local planning commission conduct studies and make recommendations for a capital improvements plan and impact fees by service unit.[1] § 6–1–

---

1. A service unit is a standardized measure of use or discharge attributable to an individual unit of development. § 6–1–920(20).

950. After notice and a public hearing, the capital improvements plan may then be adopted by the local government. § 9-1-960(A). A capital improvements plan is required before an impact fee ordinance can be enacted. § 6-1-930. The revenue from impact fees must be maintained in a separate account and used only for "the category of system improvements and within or for the benefit of the service area for which the impact fee was imposed as shown by the capital improvements plan." § 6-1-1010.

To comply with the Act, in February 2001 Town Council directed Town's planning commission to conduct studies for an impact fee. Town hired Tischler & Associates, Inc., a consulting firm, to prepare a feasibility analysis. Tischler issued its initial proposal recommending the imposition of the fees. A capital improvements plan was also drafted. Finally, in May 2002, Tischler issued an impact fee study (the "Tischler Report"), which detailed the proposed calculation of impact fees.

After several public meetings, the capital improvements plan was adopted in December 2002. The impact fee ordinance was subsequently adopted on January 8, 2003, incorporating by reference the capital improvements plan and the Tischler Report. The ordinance became effective February 1, 2003.

Trident commenced this action claiming the ordinance did not comply with the Act in several respects. The case was referred with finality to the master-in-equity who granted Town's motion for summary judgment on several grounds, including Trident's lack of standing, Trident's failure to exhaust administrative remedies, lack of an appropriate remedy, and the ordinance's compliance with the Act. Trident appeals.

## ISSUES

1. Does Trident have standing to maintain this action?
2. Was Trident required to exhaust administrative remedies?
3. Does the capital improvements plan substantially comply with the Act?
4. Is the fee calculation in the ordinance proper?

## DISCUSSION

### 1. *Standing*

■ The master found Trident had no standing to maintain this action. We disagree.

■ An organization has standing on behalf of its members if one or more of its members will suffer an individual injury by virtue of the contested act. *Sea Pines Ass'n for Protection of Wildlife, Inc. v. South Carolina Dep't of Nat. Resources,* 345 S.C. 594, 550 S.E.2d 287 (2001). The three required elements to establish standing are: an injury in fact, a causal connection, and likelihood that a favorable decision would give relief. Id. The record includes an affidavit by Frank Finlaw, president of Trident, stating he has paid more than $100,000 in impact fees since the ordinance was enacted. In the event the ordinance was invalidated, Town could be ordered to issue refunds which would be adequate redress. We conclude Trident has standing to maintain this challenge to the ordinance.

### 2. *Exhaustion of administrative remedies*

■ The master found Trident was required to exhaust administrative remedies before bringing this action. We disagree.

■ As required by the Act, Town's ordinance provides for administrative relief.[2] The ordinance provides that a refund will be issued if: (a) the fees are not expended within three years of the date they were scheduled to be spent under the capital improvements plan; or (b) a building permit was subsequently denied. This relief does not extend to the right to challenge the validity of the ordinance itself. A party is not required to exhaust administrative remedies if the issue is one that cannot be ruled upon by the administrative body. *Ward v. State,* 343 S.C. 14, 538 S.E.2d 245 (2000). We find Trident was not required to exhaust administrative remedies before bringing this action.

---

2. Section 6–1–1030(A) provides: "A governmental entity which adopts a development impact fee ordinance shall provide for administrative appeals by the developer or fee payor."

### 3. Capital improvements plan

#### a. Incorporation of Tischler Report

 Trident complains that the capital improvements plan does not comply with the Act. The document entitled "Capital Improvements Plan" is simply a list of items with cost estimates for future years.

Under the Act, a capital improvements plan is "a plan that identifies capital improvements for which development impact fees may be used as a funding source." § 6–1–920(3). Impact fees may be charged only for system improvement costs that are capital improvements included in the capital improvements plan. § 6–1–920(8) and (22)(a). The expenditure of revenue generated by impact fees is limited to capital improvements identified in the capital improvements plan. § 6–1–1010(B). Finally, under § 6–1–960(B), the capital improvements plan *must* contain:

(1) *a general description* of all existing public facilities, and their existing deficiencies, within the service area or areas of the governmental entity, *a reasonable estimate* of all costs, and *a plan to develop the funding* resources, including existing sources of revenues, related to curing the existing deficiencies including, but not limited to, the upgrading, updating, improving, expanding, or replacing of these facilities to meet existing needs and usage;

(2) an analysis of the *total capacity,* the level of *current usage,* and *commitments for usage* of capacity of existing public facilities, which must be prepared by a qualified professional using generally accepted principles and professional standards;

(3) a description of the *land use assumptions;*

(4) a definitive table establishing the *specific service unit* for each category of system improvements and an equivalency or conversion table establishing the ratio of a service unit to various types of land uses, including residential, commercial, agricultural, and industrial, as appropriate;

(5) *a description of all system improvements and their costs* necessitated by and attributable to new development in the service area, based on the approved land use assumptions, to provide a level of service not to exceed the level of

service currently existing in the community or service area, unless a different or higher level of service is required by law, court order, or safety consideration;

(6) the *total number of service units necessitated* by and attributable. to new development within the service area based on the land use assumptions and calculated in accordance with generally accepted engineering or planning criteria;

(7) the *projected demand.* for system improvements required by new service units projected over a reasonable period of time not to exceed twenty years;

(8) identification of all *sources and levels of funding* available to the governmental entity for the financing of the system improvements; and

(9) a schedule setting forth *estimated dates* for commencing and completing construction of all improvements identified in the capital improvements plan.

(emphasis added). The document entitled "Capital Improvements Plan" does not meet most of these requirements since it is simply a list of items.. Town asserts, however, that the capital improvements plan should be read together with the Tischler Report since both were enacted with and incorporated by reference into the ordinance. We agree.

Section 6–1–960(A) requires public notice and a hearing before adoption of the capital improvements plan and, under subsection (C), any change in the capital improvements plan must be approved in the same manner as the original plan. The Act also provides that the capital improvements plan originate with the local planning commission. The commission's recommendations, however, "are not binding on the government entity, which may amend or alter the plan." § 6–1–960(A). Although the Tischler Report did not originate with the planning commission, it was included in the enactment of the ordinance and was subjected to public notice and hearing. Accordingly, we find the capital improvements plan was effectively amended by the Tischler Report.

*b. Statutory compliance*

Section 6–1–930(A)(1) provides:

Only a governmental entity that has a *comprehensive plan,* as provided in Chapter 29 of this title, and which complies with the requirements of this article may impose a development impact fee. If a governmental entity has not adopted a *comprehensive plan,* but has adopted a capital improvements plan which substantially complies with the requirements of Section 6–1–960(B), then it may impose a development impact fee.

(emphasis added). Town has a comprehensive plan. Although § 6–1–930(A)(1) seems to delineate the appropriate standard of compliance for a capital improvements plan based on whether or not the local entity has a comprehensive plan, we will not read the statute to effect an absurd result. *See Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994) (when construing a statute, the Court will reject meaning that would lead to an absurd result not intended by the legislature). A local entity with the added safeguard of a comprehensive plan must be subject to the same, and not a more stringent, standard than a local entity without such a plan. We conclude this section requires that a capital improvements plan be in substantial compliance with the requirements of § 6–1–960(B), regardless of whether there is a comprehensive plan in place. Accordingly, substantial compliance with the requirements for a capital improvements plan applies here.

### c. Statutory requirements

Trident complains there is no general description of Town's existing facilities as required in § 6–1–960(B)(1). The Tischler Report references specific facilities for each of the three categories (parks and recreation, fire, and municipal). For example, a description of a facility under the Parks and Recreation category is: "an extensive trails system including four miles of hiker/biker trail improvements." This type of summary description is adequate as a general description.

Trident contends the Tischler Report failed to include "an analysis of total capacity, the level of current usage, and commitments for usage of capacity of existing public facilities" as required by § 6–1–960(B)(2). The Tischler Report does include evaluations of its existing facilities for each category of service and indicates fees are calculated to maintain the

current level of service. Because Town's existing facilities are currently functioning at an acceptable level of capacity, the fees are calculated to continue this level of service by improvement at incremental stages. This evaluation substantially complies with these requirements for a capital improvements plan.

Trident contends the capital improvements plan fails to identify "all sources and levels of funding." The Tischler Report does note that some existing construction, such as the Public Safety Building, was purchased with the proceeds of bond issues, and calculates a credit for future bond payments. Joseph Christie, the Director of Planning and Development, states in his affidavit that other funding sources were too speculative to serve as a basis for planning. Although this evaluation should have been included in the Tischler Report, there is no evidence other funding was actually available but not considered.

Trident complains the capital improvements plan does not include estimated dates for commencing and completing construction. The document entitled "Capital Improvements Plan" states the "year needed" is indicated for each capital improvement on the list of items. Although there are no commencement and completion dates, this information provides an estimate of when the funds will be needed.

Trident complains the capital improvements plan includes items that cost less than $100,000 for equipment or have a useful life of less than five years in contravention of § 6–1–920(2) and (18)(g). The original document entitled "Capital Improvements Plan" includes such items, but they are not included in the Tischler Report which actually provides the figures used for the calculation of the impact fees. The fact that these items were included in the original document has no significance in the calculation of fees.

Trident contends the capital improvements plan lacks a proportionate share analysis as required by § 6–1–990. This section provides that "an impact fee imposed upon a fee payor may not exceed a proportionate share of the costs incurred by the governmental entity in providing system improvements to serve the new development." Proportionate share is defined

as the cost attributable to the new development. Section 6–1–990(B) also lists specific factors to be considered including:

(1) cost of existing system improvements resulting from new development within the service area or areas;

(2) means by which existing system improvements have been financed;

(3) extent to which the new development contributes to the cost of system improvements;

(4) extent to which the new development is required to contribute to the cost of existing system improvements in the future;

(5) extent to which the new development is required to provide system improvements, without charge to other properties within the service area or areas;

(6) time and price differentials inherent in a fair comparison of fees paid at different times; and

(7) availability of other sources of funding system improvements including, but not limited to, user charges, general tax levies, intergovernmental transfers, and special taxation.

The Tischler Report takes into account all these factors except (6), time and price differentials. The report, however, explains that all costs are given in current dollars with no assumed inflation rate, which negates the need for time and price differentials.

Although the capital improvements plan, as amended by the Tischler Report, does not comport with every criterion of the Act, we find it substantially complies with the statutory requirements.

### 4. Calculation of fees

■ The Act provides for the calculation of impact fees in several provisions. Section 6–1–940(1) requires that the ordinance include an explanation of the calculation of the fee. Section 6–1–930(B)(2) provides that the amount of the fee "must be based on actual improvement costs or reasonable estimates of the costs, supported by sound engineering studies." Section 6–1–990 limits the impact fee to a proportionate share of the cost of improvements. Finally, § 6–1–980 provides:

### § 6–1–980. Calculation of impact fees.

(A) The impact fee for each service unit may not exceed the amount determined by dividing the costs of the capital improvements by the total number of projected service units that potentially could use the capital improvement. If the number of new service units projected over a reasonable period of time is less than the total number of new service units shown by the approved land use assumptions at full development of the service area, the maximum impact fee for each service unit must be calculated by dividing the costs of the part of the capital improvements necessitated by and attributable to the projected new service units by the total projected new service units.

(B) An impact fee must be calculated in accordance with generally accepted accounting principles.

In the Tischler Report, adopted by reference into Town's impact fee ordinance, fees were calculated as follows. First, the report identifies three categories of impact fees: parks and recreation; fire; and municipal facilities and equipment. Fees for each of these categories are calculated with the "incremental expansion method" which uses the current level of service provided by Town's facilities and assumes expansion in regular increments. This methodology essentially figures a "current replacement cost" at regular intervals to pay for the increase in demand affecting each of the three categories identified above.

For each category, the current replacement cost for each capital improvement is divided by Town's current number of demand units [3] to determine the "cost per demand unit." The impact fee is then calculated by multiplying the cost per demand unit by the "demand indicator" allocated to the type of development in question. For residential development, fees are assessed per housing unit; for non-residential development, fees are assessed per 1,000 square feet or per room for motels. As an example: A single family detached dwelling is assumed to have 2.87 demand units. The total cost per demand unit for parks and recreation is $179.27. The cost per

---

3. The report uses the 2002 population extrapolated from the 2000 census to determine demand units. A residential demand unit is per person; non-residential is employees per 1,000 square feet.

demand unit ($179.27) is multiplied by 2.87 for a fee of $514 for a single family detached dwelling for parks and recreation. This calculation is done for each category and added together for a total fee.

Trident contends this calculation of fees does not comply with the requirements of the Act in the following particulars.

### a. Actual costs or reasonable estimates

Trident claims the incremental expansion method does not use "actual costs or reasonable estimates supported by sound engineering studies" as required by § 6–1–930(B)(2). As noted above, the method used here is basically a current replacement cost approach. In determining cost, the Tischler Report refers to cost information from "Town staff" and the Marshall & Swift Valuation Service. References to Town staff refer to the Town engineer, Matt Halter, who is a "public engineer." Halter testified his cost estimates were "based on similar projects [Town] had done in the past or similar equipment [Town] had bought in the past, historic numbers typically." Halter stated he gave "engineering estimates" for items in the capital improvements plan. We find the calculation of fees was based on reasonable estimates as indicated by Town's engineer.

### b. Sound engineering studies

Trident complains Town's cost estimates were not based on sound engineering studies as required under § 6–1–930(B)(2).[4] As noted above, Town's public engineer, Matt Halter, stated he gave "engineering estimates" for the projected costs of capital improvements. The Tischler Report also references the Marshall & Swift Valuation Service, a national provider of real estate costs.[5]

---

4. This section provides: "The amount of the development impact fee must be based on actual improvement costs or reasonable estimates of the costs, supported by sound engineering studies."

5. Marshall & Swift is described on its website as follows:

Marshall & Swift serves a vital role in the real estate industry as the leading provider of building cost data. Our acclaimed cost manuals, desktop applications, online solutions and education programs help professionals create accurate cost valuations of commercial and resi-

510

The Act does not specify what constitutes an "engineering study." Since Town used its current facilities upon which to base estimated costs, engineering estimates are adequate. Further, Trident has provided no evidence indicating cost estimates would have been different had specific engineering studies been conducted. We find the use of "engineering estimates" and a widely accepted valuation service was adequate to meet the requirement of "sound engineering studies."

### c. Effect of annexation

Trident complains that in recommending impact fees, the forecasted population growth in Tischler's initial feasibility study was skewed by growth through annexation. This factor does not affect the calculation of impact fees. The purpose of the feasibility study was simply to determine whether to consider enacting such fees.

### d. Current level of service

Trident complains Town failed to evaluate the level of service for its existing facilities. "Level of service" is defined by statute as "a measure of the relationship between service capacity and service demand for public facilities." § 6-1-920(14). Generally, it is an evaluation of how well a given service meets the public's needs. Under § 6-1-930(B)(3)(b), an impact fee ordinance must "include a description of acceptable levels of service for system improvements."

Throughout the Tischler Report, the accepted level of service for projected capital improvements is the current level of service provided by Town. Joseph Christie, Town's Director of Planning and Development, testified the existing level of service was deemed adequate. This evaluation was based on citizen input. The Tischler Report specifically states Town's intent to "maintain the current level of service ... to accommodate new residential development and not to replace or rehabilitate existing facilities/improvements." This description of the level of service for capital improvements as the current level of service satisfies the Act.

dential real estate in the U.S., U.S. territories, Canada and select foreign cities worldwide.
http://www.marshallswift.com/ms-about.aspx.

We find the calculation of fees in the ordinance sufficient. Further, we note Trident offers no analysis of the various factors challenged that would actually result in different fees.

## CONCLUSION

We find that Trident had standing to maintain this action and did not have to exhaust administrative remedies. We conclude on the merits that Town's ordinance substantially complies with the statutory requirements set forth in the Act regarding the capital improvements plan and that the calculation of fees is proper. The master's order is

**AFFIRMED AS MODIFIED.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.