744 S.E.2d 505

The **STATE**, Respondent,

v.

Jennifer Rayanne **DYKES**, Appellant.

Appellate Case No. 2010–160047.

No. 27124.

Supreme Court of South Carolina.

Heard Sept. 18, 2012.

Decided May 22, 2013.

Rehearing Denied July 24, 2013.

502

Deputy Chief Appellate Defender Wanda H. Carter, of Columbia, and Christopher D. Scalzo, of Greenville, for Appellant.

Tommy Evans, Jr. and John B. Aplin, both of Columbia, for Respondent.

E. Charles Grose, Jr. of the Grose Law Firm, of Greenwood, Chief Appellate Defender Robert M. Dudek, of Columbia, and Assistant Public Defender Shane E. Goranson, of Greenwood, for Amicus Curiae, Anthony Nation.

Justice KITTREDGE.

Jennifer Dykes appeals the circuit court's order requiring that she be subject to satellite monitoring for the rest of her life pursuant to sections 23–3–540(C) and (H) of the South Carolina Code of Laws (Supp.2011). We affirm as modified.

Section 23–3–540 represents a codification of what is commonly referred to as Jessica's Law. Many states have some version of this law, which was enacted in memory of Jessica Lunsford, a nine-year-old girl who was raped and murdered by a convicted sex offender in Florida. Across the country, these laws heightened criminal sentences and post-release monitoring of child sex offenders. The specific issue presented in this case concerns the mandate for lifetime global positioning satellite monitoring with no judicial review. The complete absence of judicial review under South Carolina's legislative scheme is more stringent than the statutory scheme of other jurisdictions. A common approach among other

states is either to require a predicate finding of probability to re-offend or to provide a judicial review process, which allows for, upon a proper showing, a court order releasing the offender from the satellite monitoring requirements. *See generally,* N.C. Gen.Stat. Ann. § 14–208.43 (West 2010) (providing a termination procedure one year after the imposition of the satellite based monitoring or a risk assessment for certain offenders). While we hold that the statute's initial mandatory imposition of satellite monitoring is constitutional, the lifetime requirement without judicial review is unconstitutional.

## I.

Dykes, when twenty-six years old, was indicted for lewd act on a minor in violation of Section 16–15–140 of the South Carolina Code (2006) as a result of her sexual relationship with a fourteen-year-old female. Dykes pled guilty to lewd act on a minor and was sentenced to fifteen years' imprisonment, suspended upon the service of three years and five years' probation.[1]

Upon her release, Dykes was notified verbally and in writing that pursuant to section 23–3–540(C) she would be placed on satellite monitoring if she were to violate the terms of her probation. Shortly thereafter, Dykes violated her probation in multiple respects.[2] Dykes did not contest any of these violations, though she did offer testimony in mitigation.

The State recommended a two-year partial revocation of Dykes' probation and mandatory lifetime satellite monitoring. S.C.Code Ann. section 23–3–540(A) mandates that when an individual has been convicted of engaging in or attempting

---

1. Because her offense predated the satellite monitoring statute, she was not subject to monitoring at the time of her plea.

2. Five citations and arrest warrants were issued to her for various probation violations: a citation pertaining to her relationship with a convicted felon whom Dykes met while incarcerated and with whom she was then residing; an arrest warrant for Dykes' continued relationship with that individual; a citation for drinking an alcoholic beverage; a citation for being terminated from sex offender counseling after she cancelled or rescheduled too many appointments; and an arrest warrant for failing to maintain an approved residence and changing her address without the knowledge or consent of her probation agent.

criminal sexual conduct with a minor in the first degree (CSC–First) or lewd act on a minor, the court must order that person placed on satellite monitoring. Likewise, if a person has been convicted of such offenses before the effective date of the statute and violates a term of her probation, parole, or supervision program, she must also be placed on satellite monitoring. *See* S.C.Code Ann. § 23–3–540(C). The individual must remain on monitoring for as long as she is to remain on the sex offender registry, which is for life. S.C.Code Ann. § 23–3–540(H); *see also* S.C.Code Ann. § 23–3–460 (requiring biannual registration for life).[3] Significantly, the lifetime monitoring requirement for one convicted of CSC–First or lewd act on a minor is not subject to any judicial review process. *See* S.C.Code Ann. § 23–3–540(H) (prohibiting judicial review of the lifetime monitoring for CSC–First and lewd act on a minor).

In contrast, if a person is convicted of committing or attempting any offense which requires registration as a sex offender *other than* CSC–First or lewd act on a minor, the court has discretion with respect to whether the individual should be placed on satellite monitoring. *See* S.C.Code Ann. § 23–3–540(B), (D), (G)(1).[4] In addition, after ten years, an individual who has committed the above-stated crimes may petition the court to have the monitoring removed upon a showing that she has complied with the monitoring requirements and there is no longer a need to continue monitoring her. If the court denies her petition, she may petition again every five years.[5] S.C.Code Ann. § 23–3–540(H).

---

3. Once activated, the monitor can pinpoint the individual's location to within fifteen meters.

4. The offenses include: criminal sexual conduct with a minor in the second degree; engaging a child for sexual performance; producing, directing, or promoting sexual performance by a child; assaults with intent to commit criminal sexual conduct involving a minor; violation of the laws concerning obscenity, material harmful to minors, child exploitation, and child prostitution; kidnapping of a person under the age of eighteen unless the defendant is a parent; and trafficking in persons under the age of eighteen if the offense includes a completed or attempted criminal sexual offense. S.C.Code Ann. § 23–3–540(G)(1).

5. As long as the individual is being monitored, she must comply with all the terms set by the State, report damage to the device, pay for the costs

## II.

At her probation revocation hearing, Dykes objected to the constitutionality of mandatory lifetime monitoring. In support of her arguments, Dykes presented expert testimony that she poses a low risk of reoffending and that one's risk of reoffending cannot be determined solely by the offense committed. The State offered no evidence, relying instead on the mandatory, nondiscretionary requirement of the statute.

The circuit court found Dykes to be in willful violation of her probation and that she had notice of the potential for satellite monitoring. The court denied Dykes' constitutional challenges and found it was statutorily mandated to impose satellite monitoring without making any findings as to Dykes' likelihood of reoffending. The court also revoked Dykes' probation for two years, but it ordered that her probation be terminated upon release. This appeal followed.

## III.

The Fourteenth Amendment provides that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. Dykes contends that the imposition of mandatory, lifetime satellite monitoring without consideration of her likelihood of re-offending violates her due process rights.

### A.

Dykes asserts she has a fundamental right to be "let alone." We disagree. The United States Supreme Court has cautioned restraint in the recognition of rights deemed to be fundamental in a constitutional sense. *See Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (noting the Supreme Court's reluctance to expand the concept of substantive due process). Indeed, courts must "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy prefer-

---

of the monitoring (unless she can show financial hardship), and not remove or tamper with the device; failure to follow these rules may result in criminal penalties. S.C.Code Ann. §§ 23–3–540(I) to (L).

ences of [members of the judiciary]." *Id.* at 720, 117 S.Ct. 2258. The Due Process Clause protects only "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Id.* at 720–21, 117 S.Ct. 2258 (internal citations omitted). We reject the suggestion that a convicted child sex offender has a fundamental right to be "let alone" that is "deeply rooted in this Nation's history and tradition."

█ Our rejection of Dykes' fundamental right argument flows in part from the premise that satellite monitoring is predominantly civil. *See Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (noting that whether a statute is criminal or civil primarily is a question of statutory construction). Where, as here, the legislature deems a statutory scheme civil, "only the clearest proof" will transform a civil regulatory scheme into that which imposes a criminal penalty. *Id.* at 92, 123 S.Ct. 1140 (quoting *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997)) (internal quotations omitted).

█ Notwithstanding the absence of a fundamental right, we do find that lifetime imposition of satellite monitoring implicates a protected liberty interest to be free from permanent, unwarranted governmental interference. We agree with other jurisdictions that have held the requirement of satellite monitoring places significant restraints on offenders that amount to a liberty interest. *See Commonwealth v. Cory,* 454 Mass. 559, 911 N.E.2d 187, 196 (2009) (finding satellite monitoring burdens an offender's liberty interest in two ways, by "its permanent, physical attachment to the offender, and by its continuous surveillance of the offender's activities"); *United States v. Smedley,* 611 F.Supp.2d 971, 975 (E.D.Mo.2009) (holding that imposing home detention with electronic monitoring as condition of release impinged on liberty interest); *United States v. Merritt,* 612 F.Supp.2d 1074, 1079 (D.Neb. 2009) (stating that "[a] curfew with electronic monitoring restricts the defendant's ability to move about at will and implicates a liberty interest protected under the Due Process Clause"); *State v. Stines,* 200 N.C.App. 193, 683 S.E.2d 411 (2009) (holding that requiring enrollment in satellite-based monitoring program deprives an offender of a significant

liberty interest). Therefore, having served her sentence, Dykes' mandatory enrollment in the satellite monitoring program invokes minimal due process protection.

 Thus, courts must "ensure[ ] that legislation which deprives a person of a life, liberty, or property right have, at a minimum, a rational basis, and not be arbitrary...." *In re Treatment and Care of Luckabaugh,* 351 S.C. 122, 139–40, 568 S.E.2d 338, 346 (2002); *see also Nebbia v. N.Y.,* 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940 (1934) ("[T]he guarant[ee] of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious...."); *Hamilton v. Bd. of Trs. of Oconee Cnty. Sch. Dist.,* 282 S.C. 519, 319 S.E.2d 717 (Ct.App.1984) (holding that, to comport with due process, the legislation must have a rational basis for the deprivation and may not be "so inadequate that the judiciary will characterize it as arbitrary").

## B.

The General Assembly has expressly outlined the purpose of the state's sex offender registration and electronic monitoring provisions:

The intent of this article is to promote the state's fundamental right to provide for the public health, welfare, and safety of its citizens [by] ... provid[ing] law enforcement with the tools needed in investigating criminal offenses. Statistics show that sex offenders often pose a high risk of reoffending. Additionally, law enforcement's efforts to protect communities, conduct investigations, and apprehend offenders who commit sex offenses are impaired by the lack of information about these convicted offenders who live within the law enforcement agency's jurisdiction.

S.C.Code Ann. § 23–3–400 (2007). This Court has examined this language and held "it is clear the General Assembly did not intend to punish sex offenders, but instead intended to protect the public from those sex offenders who may re-offend and to aid law enforcement in solving sex crimes." *State v. Walls,* 348 S.C. 26, 31, 558 S.E.2d 524, 526 (2002). Thus, a likelihood of re-offending lies at the core of South Carolina's civil statutory scheme.

██ In light of the General Assembly's stated purpose of protecting the public from sex offenders and aiding law enforcement, we find that the initial mandatory imposition of satellite monitoring for certain child-sex crimes satisfies the rational relationship test. Accordingly, we find constitutional the baseline requirement of section 23–3–540(C) that individuals convicted of CSC–First or lewd act on a minor mandatorily submit to electronic monitoring upon their release from incarceration or violation of their probation or parole.

██ Although we find the initial mandatory imposition of satellite monitoring under section 23–3–540(C) constitutional, we believe the final sentence of section 23–3–540(H) is unconstitutional, for it precludes judicial review for persons convicted of CSC–First or lewd act on a minor.[6] The complete absence of any opportunity for judicial review to assess a risk of re-offending, which is beyond the norm of Jessica's law, is arbitrary and cannot be deemed rationally related to the legislature's stated purpose of protecting the public from those with a high risk of re-offending. *See Luckabaugh*, 351 S.C. at 139–40, 568 S.E.2d at 346 (finding due process ensures that a statute which deprives a person of a liberty interest has "at a minimum, a rational basis, and may not be arbitrary"); *see also Lyng v. Int'l Union*, 485 U.S. 360, 375, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) (Marshall, J., dissenting) (noting that although allegedly arbitrary legislation invokes the least intrusive rational basis test, that standard of review "is not a toothless one") (quoting *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976)); *Addington v. Texas*, 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (noting that although Texas has legitimate interest to protect the community from those that are mentally ill, Texas "has no interest in confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others").[7] Thus, we hold it is unconstitutional to impose

---

6. "A person may not petition the court if the person is required to register pursuant to this article for committing criminal sexual conduct with a minor in the first degree, pursuant to Section 16–3–655(A)(1), or committing or attempting a lewd act upon a child under sixteen, pursuant to Section 16–15–140."

7. This finding of arbitrariness is additionally supported by the South Carolina Constitution, which, unlike the United States Constitution, has

lifetime satellite monitoring with no opportunity for judicial review, as is the case with CSC–First or lewd act pursuant to section 23–3–540(H).

The finding of unconstitutionality with respect to the non-reviewable lifetime monitoring requirement in section 23–3–540(H) does not require that we invalidate the remainder of the statute. This is so because of the legislature's inclusion of a severability clause. *See* 2006 Act No. 346 § 8 (stating that if a court were to find any portion of the statute unconstitutional, that holding does not affect the rest of the statute and the General Assembly would have passed it without that ineffective part). The only provision invalidated by today's decision is the portion of section 23–3–540(H) that prohibits only those convicted of CSC–First and lewd act on a minor from petitioning for judicial relief from the satellite monitoring.[8]

---

an express privacy provision. *See* S.C. Const. art. I, § 10 ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated...."). Our constitution's privacy provision informs the analysis of whether a state law is arbitrary and lends additional support to the conclusion that section 23–3–540(H)'s preclusion of judicial review for those offenders mandated to satellite monitoring under section 23–3–540(C) is unconstitutional. *Cf. State v. Weaver*, 374 S.C. 313, 649 S.E.2d 479 (2007) (holding that by articulating a specific prohibition against unreasonable invasions of privacy, the people of South Carolina have indicated a higher level of privacy protection than the federal Constitution).

8. We respond to the dissent in two respects. First, the dissent misapprehends our position by its suggestion that "[f]ormulating the right by couching it in terms of a specific class of persons fails to appreciate the extent of the right at stake" and that "the Constitution does not recognize separate rights for different classes of citizens and instead guarantees rights to all American citizens." Certainly, in the abstract, people generally have a right to be let alone. Respectfully, however, fundamental rights are not to be defined or examined in a vacuum, but rather must be viewed in the context of the situation presented. Even the dissent's analysis so acknowledges, as it refers to Dykes's status, stating "when viewed in light of the facts of this case" and quoting Justice Kennedy's opinion in *Lawrence v. Texas*, 539 U.S. 558, 562, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), in which he observed that "[l]iberty protects the person from *unwarranted* government intrusions ...." (emphasis added). The dissent's multiple invocations of the word "unwarranted" with regard to government intrusions necessarily implicate a context-specific analysis when examining the right asserted. *Compare District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) (holding the Second Amendment confers to an

Consequently, Dykes and others similarly situated must comply with the monitoring requirement mandated by section 23–3–540(C). However, persons convicted of CSC–First and lewd act on a minor are entitled to avail themselves of the section 23–3–540(H) judicial review process as outlined for the balance of the offenses enumerated in section 23–3–540(G). We affirm the circuit court as modified.[9]

## AFFIRMED AS MODIFIED.

individual the right to keep and bear arms) *with* 18 U.S.C. § 922(g)(1) (2012) (unlawful for a person with a prior felony conviction to possess a firearm). Indeed, the question before us is whether the state may constitutionally impose civil satellite monitoring for convicted child sex offenders. In the context of this case, as much as the dissent wishes otherwise, Dykes cannot avoid her unalterable status as a convicted child sex offender, and pursuant to *Glucksberg*, she holds no fundamental right to be let alone.

Secondly, the dissent attributes to the majority a position we have never taken. With our opinion today, we have not, as the dissent suggests, upheld mandatory *lifetime* monitoring with no judicial review for assessment of the risk of reoffending. In fact, although refusing to recognize a fundamental right, we have found the statutorily prescribed mandatory lifetime monitoring without a risk assessment is arbitrary and therefore unconstitutional. Going forward, pursuant to the savings clause and despite the dissent's suggestion to the contrary, Dykes and others similarly situated are entitled to periodic judicial reviews under section 23–3–540(H) to determine if satellite monitoring remains necessary.

9. In addition to her substantive due process claim, Dykes asserts constitutional violations of procedural due process, the prohibition on *ex post facto* laws, equal protection, and unreasonable search and seizure. We reject her additional claims pursuant to Rule 220, SCACR, and the following authorities: *Connecticut v. Doe*, 538 U.S. 1, 8 (2003) (rejecting sex offender's due process argument requesting a hearing on his current level of dangerousness, and stating those "who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in the hearing are relevant to the statutory scheme"); *Smith v. Doe*, 538 U.S. 84 (2003) (rejecting an *ex post facto* challenge where sex offender registration and monitoring requirements are civil in nature); *Phillips v. State*, 331 S.C. 482, 482, 504 S.E.2d 111, 112 (1998) (holding "[i]t is not a violation of the *ex post facto* clause for the legislature to enhance punishment for a later offense based on a prior conviction, even though the enhancement provision was not in effect at the time of the prior offense"); *Grant v. S.C. Coastal Council*, 319 S.C. 348, 354, 461 S.E.2d 388, 391 (1995) ("The *sine qua non* of an equal protection claim is showing that *similarly situated* persons received disparate treatment.") (emphasis added)); *Curtis v. State*, 345 S.C. 557, 575, 549 S.E.2d 591, 600 (2001) (noting if the case does not involve a suspect classification or a fundamental right, the question is

TOAL, C.J., concurs. PLEICONES, J., concurring in result only.

HEARN, J., dissenting in a separate opinion in which BEATTY, J., concurs.

Justice HEARN.

Respectfully, I dissent. Because I believe Dykes' status as a sex offender does not diminish her entitlement to certain fundamental rights, I would hold section 23–3–540(C) is unconstitutional because it is not narrowly tailored. I express no opinion on the constitutionality of section 23–3–540(H) because that subsection was never challenged and is thus not before us.[10] Dykes' argument is, and always has been, that subsection (C) of 23–3–540—the provision requiring lifetime satellite monitoring for persons who violate a term of probation and were convicted of committing criminal sexual conduct with a minor in the first degree or committing or attempting a lewd act upon a child under sixteen—violates her substantive due process rights by imposing monitoring without any showing of her likelihood to reoffend. By invalidating a statutory provision not challenged, the majority ignores those settled princi-

whether the legislation is rationally related to a legitimate state purpose); *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.").

10. I question whether Dykes would even have standing to challenge subsection (H). The constitutional minimum of standing requires the showing of "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," a causal connection between the injury and the challenged action, and evidence that the injury will be redressed by a favorable decision. *Sea Pines Ass'n for Prot. of Wildlife, Inc. v. S.C. Dept. of Natural Res.*, 345 S.C. 594, 601, 550 S.E.2d 287, 291 (2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted)). Here, Dykes would fail the initial inquiry because she cannot demonstrate any particularized, imminent injury. Subsection (H) allows a person to petition the court for release from electronic monitoring "[t]en years from the date the person begins to be electronically monitored." Dykes was ordered to begin GPS monitoring on April 22, 2010 and would therefore not be eligible to avail herself of this provision until 2018. Any claim that she suffered an injury under subsection (H) would be speculative at this point.

ples of error preservation and appellate jurisprudence, and awards Dykes a consolation prize she has never requested and arguably has no standing to accept.

Proceeding to the question presented, I agree with Dykes that subsection (C) of 23–3–540 unconstitutionally infringes on her right to substantive due process. The Fourteenth Amendment to the United States Constitution's command that "[n]o state shall ... deprive any person of life, liberty, or property without due process of law," U.S. Const. amend. XIV, § 1, guarantees more than just fair process; it "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them,'" *County of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). The core of the Due Process Clause, therefore, is the protection against arbitrary governmental action. *Id.* at 845, 118 S.Ct. 1708.

However, one does not have a right to be free from government action merely because a law is arbitrary or unreasonable. *See Moore v. City of E. Cleveland,* 431 U.S. 494, 544, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (White, J., dissenting.). Rather, "the substantive component of the due process clause only protects from arbitrary government action that infringes a specific liberty interest." *Hawkins v. Freeman,* 195 F.3d 732, 749 (4th Cir.1999) (en banc). Substantive due process in particular protects against the arbitrary infringement of "fundamental rights that are so 'implicit in the concept of ordered liberty' that 'neither liberty nor justice would exist if they were sacrificed.'" *Doe v. Moore,* 410 F.3d 1337, 1342–43 (11th Cir.2005) (quoting *Palko v. Connecticut,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 82 L.Ed. 288 (1937), *overruled on other grounds by Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969)). If the interest infringed upon is a fundamental right, the statute must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *In re Treatment & Care of Luckabaugh,* 351 S.C. 122, 140, 568 S.E.2d 338, 347 (2002). If the right is not fundamental, the statute is only subject to rational basis review. *Luckabaugh,* 351 S.C. at 140, 568 S.E.2d at 347. Accordingly, the initial inquiry is

whether the alleged right impacted by the statute is fundamental.

As a threshold matter, I acknowledge the Court must tread carefully in this arena. Over the years, the United States Supreme Court has acknowledged the "liberty" protected by the Due Process Clause extends beyond the specific freedoms contained in the Bill of Rights. *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (noting that the Supreme Court has found the right to marry, have children, direct the education of one's children, marital privacy, use contraception, retain bodily integrity, and receive an abortion are all protected). The Supreme Court, however, "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Furthermore, when a court recognizes a right as fundamental under the umbrella of substantive due process, it effectively removes the matter from the democratic process. *Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." *Id.* (internal citations and quotations omitted). Hence, the Due Process Clause only "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *See id.* at 720–21, 117 S.Ct. 2258 (internal citations and quotations omitted).

In articulating the precise right that section 23–3–540(C) infringes, Dykes frames it as the right "to be let alone." However, in determining whether the right at stake is fundamental, we must first make "a 'careful description' of the asserted liberty right or interest [to] avoid[ ] overgeneralization in the historical inquiry." *Hawkins,* 195 F.3d at 747. I profoundly disagree with the majority's characterization of the right at issue as the right of "a convicted sex offender" to be "let alone." Formulating the right by couching it in terms of a specific class of persons fails to appreciate the extent of the

right at stake and instead focuses on the State's asserted justification for infringing upon that right. The Constitution does not recognize separate rights for different classes of citizens and instead guarantees rights to all American citizens. Furthermore, determining whether a law violates an individual's substantive due process rights is a two-pronged analysis that first requires a determination as to whether a fundamental right has been implicated, and if so, whether the State has a compelling interest to justify the infringement. Injecting the State's interest—here, Dykes' status as a convicted sex offender—into the articulation of the right at stake conflates the analysis and dooms from the outset any possibility of finding the alleged right fundamental. While a person's status as a sex offender may affect whether the State can infringe upon her fundamental rights in certain ways, that factor should be considered in the second part of the analysis. Therefore, when viewed in light of the facts of this case and the authorities relied upon by Dykes, I believe the narrow right on which she relies is the right to be free from the permanent, continuous tracking of her movements.

Although Dykes has overstated the exact right on which she relies, traditional notions of liberty and the right to be let alone are instructive for they provide the context within which the Court must analyze Dykes' specific right. Sir William Blackstone, in his landmark *Commentaries on the Laws of England*, noted the government's right to restrict an individual's free will is not immutable and any greater restriction than necessary threatens liberty in general:

> [W]e may collect that the law, which restrains a man from doing mischief to his fellow citizens, though it diminishes the natural, increases the civil liberty of mankind: but every wanton and causeless restraint on the will of the subject, whether practiced by a monarch, a nobility, or a popular assembly, is a degree of tyranny.

1 William Blackstone, *Commentaries* *121–22. Blackstone's commentary reflects our substantive due process milieu, where the core rights of freedom and liberty can only be limited when sufficiently necessary to advance the public good.

Furthermore, various members of the Supreme Court have voiced their views that the government has an acutely con-

strained power to infringe on one's liberty. Louis Brandeis, before he was appointed to the Supreme Court, wrote,

> [T]here came a recognition of man's spiritual nature, of his feelings and his intellect. Gradually the scope of these legal rights broadened; and now the right to life has come to mean the right to enjoy life,—the right to be let alone; the right to liberty secures the exercise of extensive civil privileges....

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L.Rev. 193, 193 (1890). After joining the Supreme Court, Justice Brandeis noted the Founding Fathers

> recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

*Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled in part by Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Additionally, in an oft-quoted dissent in *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), Justice Harlan wrote,

> [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints.

*Id.* at 543, 81 S.Ct. 1752 (Harlan, J., dissenting).[11] As the Supreme Court later noted, these words "eloquently" describe

---

11. The majority in *Poe* did not reach the substantive issue involved because it found the case to be nonjusticiable. *Poe*, 367 U.S. at 507–09, 81 S.Ct. 1752.

our role in the substantive due process inquiry. *Moore,* 431 U.S. at 501, 97 S.Ct. 1932.

In *Glucksberg,* however, the Supreme Court admonished overreliance on these expansive concepts of freedom in the due process analysis. Although the Supreme Court has, in the past, relied on Justice Harlan's dissent in *Poe* in its fundamental rights analysis, at no point has the Court jettisoned its "established approach" of searching for concrete examples of the claimed right in the Court's jurisprudence. *Glucksberg,* 521 U.S. at 721–22 & n. 17, 117 S.Ct. 2258. While satellite monitoring itself may not have an analogous precursor in the Court's jurisprudence, in the absence of a history to rely on in similar circumstances, the Court has resorted to examining more traditional notions of liberty. *Cf. Griswold,* 381 U.S. at 482–86, 85 S.Ct. 1678 (detailing general concepts of privacy under the Constitution and concluding that proscribing the use of contraception "is repulsive to the notions of privacy surrounding the marriage relationship"). In my opinion, the right at stake—preventing a government's ubiquitous eye from following an individual's every movement throughout her life—rests easily within our established conception of liberty. As Justice Kennedy has noted,

> Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds.

*Lawrence v. Texas,* 539 U.S. 558, 562, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). A basic tenet of liberty is that there are places and aspects of our lives in which the State may not invade without clear justification.

Recognizing the growing threat of technological advances on individual liberty, Justice Douglas warned almost fifty years ago that "[t]he dangers posed by wiretapping and electronic surveillance strike at the very heart of the democratic philosophy." *Osborn v. United States,* 385 U.S. 323, 352, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966) (Douglas, J., dissenting). Even then, the scope of the government's ability to enter an individual's private life was troubling, and it has only increased with the advent of GPS monitoring. I therefore believe an exami-

nation of the general impact of the satellite monitoring scheme is helpful in understanding how the articulated right is here infringed and the extent to which Dykes' liberty is impacted. Recently, the Supreme Court had the opportunity to consider a similar issue in *United States v. Jones*, —— U.S. ——, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), albeit in a different context. At issue in *Jones* was whether the government's surreptitious placement of a GPS tracking device on Jones's car without a warrant was an unreasonable search in violation of the Fourth Amendment to the United States Constitution. *Id.* at 947. The majority held it was because the attachment of the monitor to the car was a physical trespass on personal property for the purpose of obtaining information. *Id.* at 949.

In his concurring opinion, Justice Alito tackled the thornier question of whether this satellite monitoring violated an individual's reasonable expectation of privacy. Justice Alito observed that recent technological advancements have placed vast swaths of information in the public realm, a development which "will continue to shape the average person's expectations about the privacy of his or her daily movements."[12] *Id.* at 963 (Alito, J., concurring). With that in mind, he concluded monitoring one's movements on a public street for a relatively short period of time would not violate an individual's reasonable expectations of privacy. *Id.* at 964 (citing *United States v. Knotts*, 460 U.S. 276, 281–82, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983)). When that monitoring becomes long-term, however, the nature of the invasion changes:

> But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period.

---

12. In *Jones*, the monitor placed on the underside of Jones's car constantly tracked the car's movements over a four-week period without his knowledge. 132 S.Ct. at 947. The majority's contention to the contrary, Justice Alito noted there is no eighteenth century analogue to this type of investigation, because that "would have required either a gigantic coach, a very tiny constable, or both—not to mention a constable with incredible fortitude and patience." *Id.* at 958 (Alito, J., concurring).

*Id.* Applying this principle to the four-week monitoring at issue in *Jones,* Justice Alito concluded, "We need not identify with precision the point at which the tracking of th[e] vehicle became a search, for the line was surely crossed before the 4–week mark." *Id.*

Justice Sotomayor similarly noted we live in an age so inundated with technology that we may unwittingly "reveal a great deal of information about [our]selves to third parties in the course of carrying out mundane tasks." *Id.* at 957 (Sotomayor, J., concurring). In that vein, she agreed with Justice Alito's concerns about the intrusiveness of satellite monitoring: "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."[13] *Id.* at 955. Thus, satellite monitoring invites the State into the subject's world twenty-four hours per day, seven days per week, and it provides the State with a precise view of her intimate habits, whether she is in public or not. If we are not careful about and cognizant of this fact, "the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse" and "may 'alter the relationship between citizen and government in a way that is inimical to democratic society.'" *Id.* at 956 (quoting *United States v. Cuevas–Perez,* 640 F.3d 272, 285 (7th Cir. 2011) (Flaum, J., concurring)).

Although decided under the rubric of the Fourth Amendment, *Jones* is nevertheless instructive here. As Justice Alito and Justice Sotomayor incisively observed, the very concept of what we as citizens view as private is called into question by technology which facilitates unprecedented oversight of our lives. More importantly, at issue in this case is not just the tracking of individuals for a period of time while they are being investigated for a specific crime—as with a Fourth Amendment search—but the statutorily mandated monitoring of certain individuals for as long as they live with no ability to

---

13. Justice Alito's concurrence was joined by three other members of the Court, Justice Ginsburg, Justice Breyer, and Justice Kagan. After noting she shared the same concerns as Justice Alito, Justice Sotomayor wrote that "[r]esolution of these difficult questions ... is unnecessary" at this time because the majority's trespass theory was dispositive of the case. *Jones,* 132 S.Ct. at 957 (Sotomayor, J., concurring).

have it removed. *See Osborn,* 385 U.S. at 343, 87 S.Ct. 429 (Douglas, J., dissenting) ("These examples ... demonstrate an alarming trend whereby the privacy and dignity of our citizens is being whittled away by sometimes imperceptible steps. Taken individually, each step may be of little consequence. But when viewed as a whole, there begins to emerge a society quite unlike any we have seen—a society in which government may intrude into the secret regions of man's life at will."); *United States v. Pineda–Moreno,* 617 F.3d 1120, 1124 (9th Cir.2010) (Kozinski, J., dissenting from the denial of rehearing en banc) ("By holding that this kind of surveillance doesn't impair an individual's reasonable expectation of privacy, the panel hands the government the power to track the movements of every one of us, every day of our lives.").

I therefore conclude that the right of an individual to be free from the government's permanent, continuous tracking of her movements is easily encompassed by the larger protection of liberty and personal privacy accorded by the Constitution. As our history of protestations on government intrusion from Blackstone to *Jones* illustrates, our Constitution was designed to guarantee a certain freedom from government interference in the day-to-day order of our lives which lies at the heart of a free society. Accordingly, I believe neither liberty nor justice would exist if the government could, without sufficient justification, constantly monitor the precise location of an individual twenty-four hours a day until she dies. In my opinion, safeguarding against this Orwellian nightmare [14] falls squarely within the ambit of fundamental precepts embraced by the drafters of the Constitution. I would therefore hold that Dykes has a fundamental right to be free from the permanent, continuous tracking of her movements which the State may only infringe upon where it demonstrates the statute at issue is narrowly tailored to serve a compelling interest.

---

14. George Orwell's novel *1984* increasingly appears less of a dystopian fantasy and more a cautionary tale:

> There was of course no way of knowing whether you were being watched at any given moment. How often, or on what system, the Thought Police plugged in on any individual wire was guesswork. It was even conceivable that they watched everybody all the time.

George Orwell, *1984* 6 (1949).

Before progressing to the second portion of the analysis, I question whether the majority's holding that the statute implicates "a protected liberty interest" is meaningfully different from my conclusion that it implicates a fundamental right or whether it is just an exercise in semantics. The issue is whether the interest/right is fundamental and in my opinion, a general liberty interest in being free from permanent, unwarranted government interference is "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg,* 521 U.S. at 721, 117 S.Ct. 2258. Unpalatable though it may be to recognize that persons guilty of sex crimes against children have fundamental rights, the Constitution was not designed to protect only the rights of people we like. *See Communist Party of U.S. v. Subversive Activities Control Bd.,* 367 U.S. 1, 190, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961) (Douglas, J., dissenting) ("Our Constitution protects all minorities, no matter how despised they are."). Constant, unjustified government intrusions in the lives of an individual are the types of tyrannical acts the Founding Fathers sought to protect against when establishing our nation. I therefore believe even under the majority's iteration of the interest at stake, that interest is fundamental and the statute must be evaluated under a strict scrutiny analysis.[15] *Flores,* 507 U.S. at 302, 113 S.Ct. 1439 (1993) (holding that substantive due process "forbids the government to infringe certain 'fundamental' liberty interests *at all,* no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest"); *Luckabaugh,* 351 S.C. at 140, 568 S.E.2d at 347 (2002) (acknowledging that the constitutionality of a statute which implicated the defendant's "liberty interest from bodily restraint" should be analyzed under strict scrutiny).

---

**15.** I note as well my disagreement with the majority's assertion that merely because it is civil in nature, rather than criminal, the statute does not implicate a fundamental right. Whether a statute is characterized as civil or criminal is immaterial to this analysis and certainly not dispositive. *See Luckabaugh,* 351 S.C. at 135–140, 568 S.E.2d at 344–347 (recognizing that although the Sexually Violent Predator Act is civil and non-punitive in nature, it nevertheless infringes the "fundamental right to liberty, free from bodily restraint").

Accordingly, I proceed to the consideration of whether section 23–3–540(C) is narrowly tailored to serve a compelling state interest—thus surviving strict scrutiny—and conclude it is not. One cannot "minimize the importance and fundamental nature of [an individual's liberty interest]. But, as our cases hold, this right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society." *United States v. Salerno*, 481 U.S. 739, 750–51, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Dykes concedes that protecting the public from sex offenders who pose a high risk of reoffending is a compelling state interest; nevertheless, she steadfastly maintains, and I agree, that protecting the public from those who have a low risk of reoffending is not.

It is beyond question that "[s]ex offenders are a serious threat in this Nation." *McKune v. Lile*, 536 U.S. 24, 32, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002). In fact, "the victims of sexual assault are most often juveniles," and "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *Id.* at 32–33, 122 S.Ct. 2017. Thus, the General Assembly noted "[s]tatistics show that sex offenders often pose a high risk of re-offending," S.C.Code Ann. § 23–3–400 (2007), prompting it to enact provisions "to protect the public from those sex offenders who may re-offend," *State v. Walls*, 348 S.C. 26, 31, 558 S.E.2d 524, 526 (2002). Accordingly, I recognize Dykes' status as a convicted sex offender is relevant to the analysis. However, any infringement which is substantially justified by the possibility that an individual may reoffend—without any actual consideration of her likelihood to reoffend—belies a conclusion that the statute is narrowly tailored. Monitoring sex offenders who pose a low risk of reoffending for the rest of their lives is not "sufficiently weighty" such that the subject's liberty interest in being free from government monitoring must be "subordinated to the greater needs of society." *Salerno*, 481 U.S. at 750–51, 107 S.Ct. 2095.

I therefore find that requiring Dykes to submit to satellite monitoring for the rest of her life without an assessment of her risk of reoffending violates her substantive due process rights. To paraphrase Blackstone, section 23–3–540(C)'s ap-

plication to Dykes has the potential to decrease her natural liberty without any attendant increase in overall civil liberty. Accordingly, I would hold that subsection (C) of 23–3–540 is unconstitutional and must be stricken from the statute.

BEATTY, J., concurs.