# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Kristin Joseph, P.T., Thomas N. Joseph, M.D., and William G. McCarthy, M.D., Appellants,

v.

South Carolina Department of Labor, Licensing and Regulation, South Carolina Board of Physical Therapy, Respondents,

and

South Carolina Chapter, American Physical Therapy Association, Joseph M. McKowen, PT, Sabrina Queen Bridges, PTA, and Amalia W. Kirby, PTA, Respondents.

Appellate Case No. 2014-001115

---

Appeal From Richland County
The Honorable G. Thomas Cooper, Jr., Circuit Court Judge

---

Opinion No. 27666
Heard February 19, 2015 – Filed September 14, 2016

---

**REVERSED**

---

M. Elizabeth Crum, of McNair Law Firm, P.A., of Columbia, for Appellants.  Monteith P. Todd, of Sowell Gray Stepp & Laffitte, L.L.C., of Columbia, S. Jahue Moore and John C. Bradley, Jr., both of Moore Taylor Law Firm, of West Columbia, N. Thomas Connally, III,

of Hogan Lovells US LLP, of McLean, Virginia and John R. Devlin, Jr., of Devlin & Parkinson, P.A., of Greenville, for Respondents.

_____

**ACTING JUSTICE TOAL:**    This is the latest in a longstanding disagreement regarding how the practice of physical therapy should be regulated in South Carolina.  The South Carolina Board of Physical Therapy (the Board) has sided with members of the profession who desire to prevent physical therapists (PTs) from providing treatment as direct employees of physicians.  The Board has long sought to require PTs to provide their services directly to patients or through a practice group of PTs.  However, other licensed healthcare professionals in South Carolina, such as occupational therapists, speech pathologists, and nurse practitioners may be employed by physicians.  Thus, the PTs stand alone in South Carolina.  Physicians' offices may not provide PT services by employing licensed PTs, and PTs may not provide services while employed by a physician or physicians' practice group.

With this background in mind, Kristin Joseph, a PT, and two orthopedic surgeons, Doctors Thomas N. Joseph and William G. McCarthy (collectively, Appellants) appeal the circuit court's order dismissing their claims challenging a 2011 position statement from the Board, which opined that within a group practice, if a PT or physical therapist assistant (PTA) provides services to a patient—at the request of another PT or PTA employed within the same practice—the act does not constitute a "referral" under section 40-45-110(A)(1) of the South Carolina Code, as construed in *Sloan v. South Carolina Board of Physical Therapy Examiners*, 370 S.C. 452, 636 S.E.2d 598 (2006).  We overrule our decision in *Sloan*, and reverse the circuit court's order in this case.

## FACTS/PROCEDURAL HISTORY

This case arises from a 2011 position statement in which the Board interpreted the fee for referral prohibition contained in section 40-45-110(A)(1) of the South Carolina Code as being inapplicable to individual PTs' or associated PT groups' employment of other PTs or PTAs.  Section 40-45-110(A)(1) allows the Board to take disciplinary action against a PT who

requests, receives, participates, or engages directly or indirectly in the dividing, transferring, assigning, rebating, or refunding of fees

received for professional services or profits by means of a credit or other valuable consideration including, but not limited to, wages, an unearned commission, discount, or gratuity with a person who referred a patient, or with a relative or business associate of the referring person.

S.C. Code Ann. § 40-45-110(A)(1) (2011).

The 2011 Position Statement was the Board's second position statement interpreting section 40-45-110(A)(1). The Board first issued a position statement in 2004 (2004 Position Statement), endorsing an opinion of the South Carolina Attorney General, which concluded that a PT would violate section 40-45-110(A)(1) if he or she was employed by a physician or physician groups, and accepted wages for treatment of patients referred by the employing physician or group. *See* S.C. Atty. Gen. Op. dated March 30, 2004 (2004 WL 736934). Specifically, the Attorney General's opinion addressed two questions concerning the use of the word "person" in section 40-45-110(A)(1) as it relates to physicians. *See id.* It opined first that physicians were persons within the meaning of the statute, and that PTs could not be employed by physicians or physician groups and receive wages to treat patients referred by the physician or group for physical therapy services. *Id.*

Subsequent to the 2004 Position Statement, Dr. Allen Sloan, along with other physicians, PTs, and other medical professional associations, brought an action in circuit court seeking a declaratory judgment that a physician may lawfully employ a PT and refer patients to that PT. *Sloan*, 370 S.C. at 466, 636 S.E.2d at 605. Ultimately, the circuit court dismissed the plaintiffs' causes of actions. *Id.* On appeal, this Court affirmed the circuit court's ruling in a 3-2 decision. *Id.* at 485–86, 636 S.E.2d at 616.

The majority held that the circuit court correctly interpreted section 40-45-110(A)(1) as prohibiting in-practice referrals from a physician to a PT. *Id.* at 473, 636 S.E.2d at 609. The majority further found that the Board's formal endorsement of the Attorney General's opinion did not constitute improper rulemaking in violation of the Administrative Procedures Act (APA) because it was "nothing more than a policy or guidance statement which does not have the force or effect of law in any individual case." *Id.* at 474, 636 S.E.2d at 610.

The majority rejected appellants' constitutional challenges to section 40-45-110(A)(1).  *Id.* at 476–86, 636 S.E.2d at 611–16.  The majority held that section 40-45-110(A)(1) did not violate the equal protection rights of PTs who wish to be employed by physicians who refer patients to them, because the Legislature had "a rational basis for defining the pertinent classification in this instance as the class of physical therapists [which was to avoid] overuse of physical therapy services and actual and potential conflicts of interest stemming from a physician's financial interest in the provision of therapy services."  *Id.* at 481–82, 636 S.E.2d at 613–14.  The majority further held that "[t]he statute prohibiting employment relationships between physicians and physical therapists bears a reasonable relationship to a legitimate interest of government, and the Legislature has not engaged in an arbitrary or wrongful act in enacting the statute."  *Id.* at 484, 636 S.E.2d at 615.  Finally, the majority found no procedural due process violation, as:  (1) the hearing at issue was a regularly scheduled meeting during which the appellants' representatives were present to offer comments regarding their respective positions; (2) the Board voted in open session to adopt the Attorney General's opinion; and (3) the Board began enforcing the statute following a ninety-day grace period.  *Id.* at 485, 636 S.E.2d at 615.

The dissent, however, would have held that the plain language of section 40-45-110(A)(1) does not prohibit all employee-employer relationships between a physician and PT.  *Id.* at 486, 636 S.E.2d at 616 (Toal, C.J., dissenting).  Although the dissent agreed that there had been no violation of the appellants' procedural due process rights, in the dissent's view, the majority's interpretation of the statute would result in a violation of the plaintiffs' rights to equal protection and due process.  *Id.* (Toal, C.J., dissenting).  Finally, the dissent would have found that the Board failed to comply with the APA in adopting the Attorney General's opinion, thereby promulgating an invalid regulation.  *Id.* (Toal, C.J., dissenting).[1]

On May 3, 2011, Robert Carpenter, a practicing PT, wrote a letter to the Board requesting that it issue a position statement addressing whether section 40-45-110(A)(1) prohibits:  (1) a physical therapist from working for pay for another PT, PTA, or group of PTs when the PT or PTA refers a patient to another PT or

---

[1] Subsequent to this Court's decision in *Sloan*, two companion bills were introduced in the Legislature in an attempt to overturn the statutory prohibition on PTs working for physicians.  The bills, however, were unsuccessful.  *See* S.B. 1031, H.B. 4329, 118th Gen. Assemb., Reg. Session (S.C. 2010).

PTA for physical therapy services; and (2) a PT or PTA from working for pay for a professional corporation owned by one or more licensed PTs when a PT owner or employee of the corporation refers a patient to the PT for physical therapy services.

On June 2, 2011, Marilyn Swygert, the Chairman of the Board responded with a letter entitled: "Application of S.C. Code Ann. Sec. 40-45-110(A)(1) to Intra-Professional Interactions."  In the letter, Swygert stated that in her view, the answer to both of Carpenter's questions was "no."  During a regularly scheduled meeting on August 17, 2011, the Board voted to adopt the position stated in Swygert's letter.  The Board subsequently posted a position statement (2011 Position Statement) on its website.  The 2011 Position Statement provided, in pertinent part:

> In a group practice, a [PT] or [PTA] providing services to a patient of that practice should not fall within this definition of a "referral."  The [PT] or [PTA] seeing a patient at the request of another [PT] in the same group does not constitute a "referral," but is rather a [PT] or [PTA] providing coverage either within the 30-day window or pursuant to the same referral from a physician or other member of the group.

Shortly thereafter, Appellants filed a declaratory judgment action against the Board and the South Carolina Department of Labor, Licensing, and Regulation (collectively, Respondents).  In Appellants' first six causes of action, they challenged the 2011 Position Statement on the grounds that it:  (1) is contrary to the plain language of section 40-45-110(A)(1) given that there is no distinction between a "referral" from a physician to a PT and "coverage" between PTs; (2) exceeds the agency's authority under the APA; and (3) is in violation of Appellants' state and federal constitutional rights to due process and equal protection.[2]  In the alternative, Appellants argued that if the "coverage" exception is a proper interpretation of section 40-45-110(A)(1), it should be applied equally to physician and physician owned practices.  Appellants' seventh through ninth causes of action sought to argue against the precedent in *Sloan*, contending that the Court in *Sloan* incorrectly interpreted section 40-45-110(A)(1) to prohibit a physician or physician group from employing a PT and referring a patient to the PT for physical therapy services.

---

[2] U.S. Const. amend. XIV, § 1; S.C. Const. art. I, § 3.

Respondents moved to dismiss the case, arguing: there was no justiciable controversy; Appellants lacked standing; the complaint failed to state a claim as to the seventh through ninth causes of action; the complaint stated no claim upon which relief could be granted; and Appellants' claims were not ripe for review. After a hearing, the circuit court granted Respondents' motion in part. In so ruling, the court converted Respondents' motion to one for partial summary judgment with respect to Appellants' seventh through ninth causes of action, finding that it was "bound by the Supreme Court's decision in *Sloan*" and that it had no authority to overrule *Sloan*. The circuit court denied Respondents' motion as to Appellants' causes of action one through six. The circuit court further found that Appellants had standing to bring their claims because Appellants' injury is "the infringement on their abilities to practice their chosen profession and the disparate treatment under the 2011 Position Statement in allowing PTs or PT groups to refer patients for PT services to PTs under the guise of 'coverage' and not allowing physicians or physician groups to refer patients for PT services to employed PTs under the guise of 'coverage.'" In addition, the circuit court ruled that standing could be conferred on appellants as the procedural and substantive implications of the 2011 Position Statement constituted an issue of public importance.

Subsequently, Appellants moved for summary judgment on their first through sixth causes of action, and Respondents filed cross-motions for summary judgment. The circuit court held a hearing on January 1, 2014, and on April 22, 2014, entered an order granting Respondents' motions for summary judgment and denying Appellants' motion for summary judgment.

In upholding the 2011 Position Statement, the circuit court found that the transition in treatment of patients from one PT to another PT or PTA within a group physical therapy practice was not a "referral" prohibited by section 40-45-110(A)(1), as interpreted by *Sloan*. According to the circuit court, "referrals" targeted by section 40-45-110(A)(1) are limited to "referrals of gatekeeping physicians," and not the "transition of patients from one PT to another PT within a group practice [that] normally occurs as a simple function of scheduling and patient request or convenience." The court also concluded that "a PT sending or directing a patient to another PT (or PTA) for treatment within a group practice does not implicate the potential abuse that the Legislature sought to curtail in enacting the prohibition on self-interested 'referrals' in [section] 40-45-110(A)(1), namely overuse of physical therapy services." The court further stated that

prohibiting the transition of patients from one PT to another would effectively ban the group practice of physical therapy, as PTs would be "forced to operate as solo practitioners in order to continue their practice."

The circuit court rejected Appellants' alternative argument that, even if the 2011 Position Statement properly interpreted section 40-45-110(A)(1), PTs should be able to work for referring physicians because their treatment of referred patients would merely be "coverage" for the referring physician. The court refused to "create a backdoor around *Sloan*," determining that Appellants' requested "coverage" exception would impermissibly "declare conduct lawful that *Sloan* declared unlawful." As for Appellants' argument with regard to the APA, the circuit court found that the 2011 Position Statement did not violate the APA because—similar to the 2004 Position Statement in *Sloan*—it is "not a regulation or the equivalent of a regulation."

Finally, the circuit court disagreed with Appellants' claim that the 2011 Position Statement violated their equal protection and due process rights. After noting that these claims were "foreclosed by the [this] Court's decision in *Sloan*," it stated that "both *Sloan* and the 2011 Position Statement treat all physicians the same as all other physicians, and all PTs the same as all other PTs." The court also found that the 2011 Position Statement "does not prohibit [Appellants] from doing anything, and thus does not deprive them of any property right, with or without due process."

Following the circuit court's denial of their motion to reconsider pursuant to Rule 59(e), SCRCP, Appellants appealed the circuit court's order to the court of appeals. This Court granted Appellants' motion to certify the appeal pursuant to Rule 204(b), SCACR. Subsequently, the Court granted Appellants' motion to argue against *Sloan* pursuant to Rule 217, SCACR.

## STANDARD OF REVIEW

On review of an order granting summary judgment, the appellate court applies the same standard as that used by the trial court pursuant to Rule 56(c), SCRCP. *Turner v. Milliman*, 392 S.C. 116, 122, 708 S.E.2d 766, 769 (2011); *see* Rule 56(c), SCRCP. Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP;

*Turner*, 392 S.C. at 766, 708 S.E.2d at 769. In an appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in the light most favorable to the non-moving party. *Willis v. Wu*, 362 S.C. 146, 151, 607 S.E.2d 63, 65 (2004).

ANALYSIS

## I.      Standing

As an initial matter, we address Respondents' contention that Appellants lack standing to challenge the 2011 Position Statement, and hold that Appellants have standing to bring their claims.

A fundamental prerequisite to institute an action is the requirement that the plaintiff have standing. *Blandon v. Coleman*, 285 S.C. 472, 330 S.E.2d 298 (1985). Standing is defined as "a personal stake in the subject matter of a lawsuit." *Sea Pines Ass'n for the Prot. Of Wildlife, Inc. v. S.C. Dep't of Natural Res.*, 345 S.C. 594, 600, 550 S.E.2d 287, 291 (2001) (citing *Charleston Cnty. Sch. Dist. v. Charleston Cnty. Election Comm'n*, 336 S.C. 174, 519 S.E.2d 567 (1999)). The United States Supreme Court has set forth the "irreducible constitutional minimum of standing," which consists of three elements: (1) the plaintiff must have suffered an "injury in fact;" (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be "redressed by a favorable decision." *Sea Pines Ass'n for Prot. of Wildlife, Inc.*, 345 S.C. at 601, 550 S.E.2d at 291 (internal citations omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61 (1992)). A party seeking to establish standing carries the burden of demonstrating each element. *Id.* (citing *Lujan*, 504 U.S. at 561).

This declaratory judgment action was initiated by a physical therapist and two orthopedic surgeons. It is difficult to conceive of individuals more impacted by this Court's decision in *Sloan* and the 2011 Position Statement from the South Carolina Board of Physical Therapy. PT Joseph has been injured by the infringement on her ability to practice her chosen profession and by the adoption of a regulation that requires she and other PTs be treated differently from other health care professionals who may be employed by doctors. By extension, Drs. Joseph and McCarthy have been injured because they have an interest in how the PT system works and in their ability to employ PTs. Further, a causal connection exists between Appellants' injury and the Board's challenged actions, including the

2011 Position Statement, and there is a likelihood that their injuries would be redressed by a favorable decision. *See id.* at 601, 550 S.E.2d at 291.

The dissent supports its position that Appellants lack standing, in part, on the fact that "PT Joseph will not be punished or disciplined as a result of the 2011 Position Statement." Thus, under the dissent's analysis no party could *ever* achieve the requisite standing to challenge *Sloan* unless a party consciously disregarded the opinion and willfully violated the law. The only viable avenue to seek redress and access to our courts cannot be solely through disregarding our laws.

The ability to challenge precedent is a paramount principle of our judicial system. *Sloan v. Sanford*, 357 S.C. 431, 434, 593 S.E.2d 470, 472 (2004) ("Citizens must be afforded access to the judicial process to address alleged injustices."). This is especially true in this context where Appellants brought claims under the Declaratory Judgment Act, which affords a party the right to question the construction or validity of a statute or legal instrument that allegedly affects a right, status, or legal relationship. S.C. Code Ann. § 15-53-30 (2005); *see also Pond Place Partners, Inc. v. Poole*, 351 S.C. 1, 16, 567 S.E.2d 881, 888–89 (Ct. App. 2002) (quoting another source) ("The Declaratory Judgment Act should be liberally construed to accomplish its intended purpose of affording a speedy and inexpensive method of deciding legal disputes and of settling legal rights and relationships, without awaiting a violation of the rights or a disturbance of the relationships."). Accordingly, we decline to create an insurmountable hurdle—as the dissent would have us do—for parties to gain access to our courts.

## II.    Overruling *Sloan*

On the merits, Appellants argue, *inter alia*, that the 2011 Position Statement violates their constitutional rights to equal protection and due process by allowing PTs to be employed by another PT or a physical therapy group and provide physical therapy services to patients referred by the employer, whereas *Sloan* does not allow PTs to be employed by a physician or physician group and provide physical therapy services to the employer's referred patient. For the same reasons discussed in the dissent in *Sloan*, we take this opportunity to overrule that decision. *See* 370 S.C. at 486–94, 636 S.E.2d at 616–20 (Toal, C.J. dissenting).

While adherence to precedent under the rubric of *stare decisis* is commendable and provides certainty and consistency within our judicial system, adherence to precedent that is wrong serves no such laudable purpose. *McLeod v.*

*Starnes*, 396 S.C. 647, 654, 723 S.E.2d 198, 202 (2012) (alteration in original) (quoting another source) ("There is no virtue in sinning against light or persisting in palpable error, for nothing is settled until it is settled right. . . . There should be no blind adherence to a precedent which, if it is wrong, should be corrected at the first practical moment."). The underpinning of *Sloan* is the assumption that physicians who refer patients to physical therapists under their employ will act in bad faith or be mired in a conflict of interest because of the financial remuneration they receive from the provision of such service. We choose to make no such assumption concerning our brothers and sisters in the medical profession.

The Equal Protection Clause provides, "nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Where an alleged equal protection violation does not implicate a suspect class or abridge a fundamental right, the rational basis test is used. *Denene, Inc. v. City of Charleston,* 359 S.C. 85, 91, 596 S.E.2d 917, 920 (2004) (citation omitted). Under the rational basis test, the Court must determine: (1) whether the law treats similarly situated entities differently; (2) if so, whether the legislative body has a rational basis for the disparate treatment; and (3) whether the disparate treatment bears a rational relationship to a legitimate government purpose. *Dunes W. Golf Club, LLC v. Town of Mount Pleasant*, 401 S.C. 280, 293-94, 737 S.E.2d 601, 608 (2013) (citing *Ed Robinson Laundry & Dry Cleaning, Inc. v. S.C. Dep't of Rev.,* 356 S.C. 120, 124, 588 S.E.2d 97, 99 (2003)).

In *Sloan*, this Court interpreted section 40-45-110(A)(1) of the South Carolina Code as prohibiting a PT from being employed by a physician when the physician refers patients to the PT for services. Contrary to that decision, we now find that the classification, which distinguishes PTs from other licensed health care professionals, has no rational relationship to the legislative purpose of the statute—to protect consumers and government-sponsored health care programs from conflicts of interest and potential misuse of medical services. *See id.* at 493–94, 636 S.E.2d at 619–20. Section 40-45-110(A)(1) should prevent only referral-for-pay situations, an interpretation which comports with the clear purpose of the statute. The overarching prohibition created as a result of the Court's opinion in *Sloan* is arbitrary and not calculated to avoid the legislative purpose of prohibiting the unethical behavior of receiving or giving illegal kickbacks and participating in referral-for-pay agreements. *Id.* at 489, 636 S.E.2d at 617. To find otherwise would be arbitrary and violative of the equal protection rights of PTs.

Although, under *Sloan*, physicians may employ other healthcare professionals such as occupational therapists, speech pathologists, and nurse practitioners, they may not employ PTs.  Neither the *Sloan* opinion nor Appellants have articulated any plausible reason as to why PTs are so different from other health care professionals that they must be singled out and provided disparate treatment for self-referral purposes.  Accordingly, the Court's interpretation in *Sloan* constitutes an equal protection violation.  In addition, the interpretation violates the substantive due process rights of physical therapists by imposing an arbitrary restriction upon physical therapists while preserving those employment relationships for all other health care providers and allied health professionals.  *See Worsley Co., Inc. v. Town of Mount Pleasant*, 339 S.C. 51, 56, 528 S.E.2d 657, 660 (2000) ("Substantive due process protects a person from being deprived of life, liberty or property for arbitrary reasons." (citing *Anco, Inc. v. State Health & Human Services Finance Comm'n,* 300 S.C. 432, 388 S.E.2d 780 (1989)).

We now recognize that the interpretation in *Sloan* creates an absurd situation by strictly prohibiting physician-PT employment relationship without considering the resulting ethical implications or patient wellbeing.  *See id.* at 489, 636 S.E.2d at 617.  In fact, prohibiting physicians' employment of PTs deprives physicians of their right to practice medicine in the best interests of their patients.  As interpreted in *Sloan,* section 40-45-110(A)(1) appears merely to be anti-competitive protectionist legislation intended to protect personal financial interests, which is driven by reimbursement purposes, rather than actual benefits to patients.  Accordingly, we overrule *Sloan* as an unconstitutional interpretation of section 40-45-110(A)(1), and hold that the statute prohibits only referral-for-pay situations rather than prohibiting all employer-employee relationships between physicians and physical therapists.

We acknowledge that the Legislature's failure to alter a statute constitutes "evidence the Legislature agrees with this Court's interpretation" of the statute.  *See McLeod*, 396 S.C. at 660, 723 S.E.2d at 205.  In this case, however, it is of no moment that the General Assembly has not acted to alter section 40-45-110(A)(1) in light of our decision in *Sloan*. It is the duty of this Court, not the legislature, to determine the constitutionality of a statute. Because we hold that the majority's construction of the statute in *Sloan* is unconstitutional, this inaction on the part of the legislature is irrelevant.

### III.    2011 Position Statement

The 2011 Position Statement expands upon the harm done by the majority's interpretation of section 40-45-110(A) in *Sloan* by permitting PTs to refer patients to other PTs within the same group practice—when, under *Sloan*, physicians are not permitted to make similar self-referrals.  For the reasons discussed, *infra*, and because we overrule *Sloan*, we therefore reverse the circuit court's grant of summary judgment to Respondents.

Moreover, we hold that the Board's adoption of the 2011 Position Statement violates the requirements of the APA.  The circuit court found that the 2011 Position Statement "is not a regulation or the equivalent of a regulation."  To the contrary, the 2011 Position Statement was adopted to protect PTs and PT groups from disciplinary action under section 40-45-110(A)(1), was intended to have the force of law, and therefore constitutes a binding norm.

Under the APA, a regulation is defined as an "agency statement of general public applicability that implements or prescribes law or policy or practice requirements of any agency.  Policy or guidance issued by an agency other than in a regulation does not have the force or effect of law."  S.C. Code Ann. § 1-23-10(4) (2005).  Whether a particular agency creates a regulation or simply announces a general policy statement depends on whether the agency action establishes a "binding norm."  *Home Health Serv., Inc. v. S.C. Tax Com'n*, 312 S.C. 324, 328, 440 S.E.2d 375, 378 (1994).  The "key inquiry" is

> the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion.  As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm.

*Sloan*, 370 S.C. at 491, 636 S.E.2d 598 (Toal, C.J., dissenting) (quoting *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983)).  "When there is a close question whether a pronouncement is a policy statement or a

regulation, the [agency] should promulgate the ruling as a regulation in compliance with the APA." *Home Health Serv., Inc. v. S.C. Tax Com'n*, 312 S.C. at 329, 440 S.E.2d at 378.

Article I, section 22 of our state's constitution provides that "[n]o person shall be finally bound by a judicial or quasi-judicial decision of an administrative agency affecting private rights except on due notice and an opportunity to be heard ... and he shall have in all such instances the right to judicial review." S.C. Const. art. I, § 22. Further, the APA specifically requires an agency to: provide public notice of a drafting period where public comments can be accepted; conduct a public hearing on the proposed regulation; possibly prepare reports about the regulation's impact on the economy, environment, and public health; and submit the regulation to the Legislature for review, modification, and approval or rejection. S.C. Code Ann. §§ 1-23-110 to -160 (2005).

The Board satisfied none of these requirements when it adopted the 2011 Position Statement. In adopting the 2011 Position Statement, the Board merely identified the consideration of Swygert's letter on its agenda as "discussion of Intra-Professional Interactions"—thus essentially providing no notice to the public of what the Board was deciding.

Moreover, the Board intended PTs and PT groups to rely on the 2011 Position Statement. The 2011 Position Statement leaves no question regarding whether a PT employed by another PT or PT group who is directed patients for physical therapy, and is paid for those services, is in violation of the referral for profit prohibition in section 40-45-110(A)(1). Based on the 2011 Position Statement, the Board is not free to exercise its discretion as to whether to follow the position set forth in the 2011 Position Statement in an individual case. In other words, the 2011 Position Statement constitutes a "binding norm," and has the effect of a regulation under the APA. The Board's process in adopting the 2011 Position Statement thus amounts to administrative overreach that attempts to end run the legislative process. Accordingly, we hold that the Board violated the APA by adopting the 2011 Position Statement without promulgating it as a regulation.[3]

_____

[3] We embrace completely the excellent comprehensive analysis of administrative agency rulemaking set forth in sections I, II, and III of Justice Kittredge's concurring opinion. We believe both the statutory law of South Carolina and Article I, section 22 of the South Carolina Constitution are violated by the Board's attempt to use its 2011 position statement to regulate the practice of physical

## CONCLUSION

Based on the foregoing, we overrule *Sloan* and reverse the circuit court's decision granting Respondents' motion for summary judgment.

**HEARN, J., concurs. KITTREDGE, J., concurring in result in a separate opinion. BEATTY, J., dissenting in a separate opinion in which PLEICONES, C.J., concurs.**

---

therapy without submitting it to the General Assembly as a proposed agency regulation following the requirements of the South Carolina Administrative Procedures Act.

That said we adhere to the finding in the majority opinion that the Board's actions also violate the equal protection and due process protections of the United States Constitution.

**JUSTICE KITTREDGE:**  This case brings the Court face-to-face with the leviathan known as administrative agency rule-making—the so-called Fourth Branch of government—and illustrates the danger it poses to the once sacrosanct constitutional principle of separation of powers.  Therefore, I concur in the result reached by the majority, which overrules *Sloan v. South Carolina Board of Physical Therapy Examiners*, 370 S.C. 452, 636 S.E.2d 598 (2006), for *Sloan* allowed the State's administrative agencies to effectively ignore the rule-making requirements of the Administrative Procedures Act (APA).[4]  However, I would not go as far as the majority in declaring *Sloan*'s interpretation of section 40-45-110(A)(1)[5] (the Statute) unconstitutional.  I would resolve this case solely on statutory grounds, leaving the constitutional issue for a later day, when it may be considered in the context of a properly promulgated regulation.  *See, e.g.*, *In re Care & Treatment of McCracken*, 346 S.C. 87, 92, 551 S.E.2d 235, 238 (2001) ("[I]t is this Court's firm policy to decline to rule on constitutional issues unless such a ruling is required." (citing *Fairway Ford, Inc. v. Cnty. of Greenville*, 324 S.C. 84, 86, 476 S.E.2d 490, 491 (1996))).  Therefore, beyond the majority's analysis concerning standing, I would go only so far as applying then-Chief Justice Toal's analysis of the APA in *Sloan* to the facts of this case.  *See Sloan*, 370 S.C. at 486, 636 S.E.2d at 616 (Toal, C.J., dissenting) (concluding that, by issuing a position statement adopting a 2004 Attorney General opinion interpreting the Statute, the South Carolina Board of Physical Therapy Examiners (the Board) ignored the APA's requirements and promulgated an invalid regulation).  In my view, the Board's 2011 position statement suffers from the same infirmity as its 2004 counterpart and is likewise invalid.

## I.

This case implicates far more than the practice of physical therapy in South Carolina, for it touches on an issue central to the constitutional framework of our republic.  We once viewed the three branches of that government as separate, each operating in a distinct sphere within which its authority was inviolable.  *See, e.g.*, *Palmetto Golf Club v. Robinson*, 143 S.C. 347, 373, 141 S.E. 610, 617 (1928) (Carter, J., concurring) ("Under the Constitution of South Carolina, the three branches of the government, legislative, judicial, and executive, have separate

---

[4] *See* S.C. Code Ann. §§ 1-23-10 to -300 (2005 & Supp. 2015).

[5] *Id.* § 40-45-110(A)(1) (2011).

functions to perform, and one branch of the government must not encroach upon the other . . . ."). That division has become blurred in the area of administrative law, where executive branch agencies routinely perform functions traditionally within the sole province of the other two branches of government. *See, e.g.*, *City of Arlington v. FCC*, 133 S. Ct. 1863, 1877–78 (2013) (Roberts, C.J., dissenting) (noting that administrative agencies, although part of the executive branch, "exercise legislative power, by promulgating regulations with the force of law; executive power, by policing compliance with those regulations; and judicial power, by adjudicating enforcement actions and imposing sanctions on those found to have violated their rules"); *FTC v. Ruberoid Co.*, 343 U.S. 470, 487–88 (1952) (Jackson, J., dissenting) (noting that administrative agencies are often referred to as "quasi-legislative, quasi-executive[,] or quasi-judicial" and that use of the qualifier "quasi" is an implicit acknowledgment "that all recognized classifications have broken down"); *see also id.* at 487 ("[Administrative agencies] have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories much as the concept of a fourth dimension unsettles our three-dimensional thinking.").

The rise of administrative agencies has allowed legislatures, with the courts' blessing, to increasingly abdicate their lawmaking responsibility. *See City of Arlington*, 133 S. Ct. at 1886 (Roberts, C.J., dissenting) (describing the rise of administrative agencies as the vehicle through which a "dramatic shift in power" from Congress to the executive branch has occurred over the past half century); *Fed. Power Comm'n v. New Eng. Power Co.*, 415 U.S. 345, 352–53 (1974) (Marshall, J., concurring in result) ("The notion that the Constitution narrowly confines the power of Congress to delegate authority to administrative agencies, which was briefly in vogue in the 1930's, has been virtually abandoned by the Court for all practical purposes . . . ."). Even as early as 1952, Justice Jackson could say that "perhaps more values today are affected by [administrative agencies'] decisions than by those of all the courts." *Ruberoid Co.*, 343 U.S. at 487 (Jackson, J., dissenting). This trend has continued over the decades and regrettably shows no signs of slowing down any time soon. *See City of Arlington*, 133 S. Ct. at 1878 (Roberts, C.J., dissenting) (noting that Congress created more than fifty new agencies between 1997 and 2012 and "more are on the way"); *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, No. 14-3243, 2016 WL 3064870, at *1 (10th Cir. May 31, 2016) ("The number of formal rules [administrative] agencies have issued thanks to their delegated legislative authority has grown so exuberantly it's hard to keep up. The Code of Federal Regulations now clocks in at over 175,000 pages. And no one seems sure how many more hundreds of thousands (or maybe

millions) of pages of less formal or 'sub-regulatory' policy manuals, directives, and the like might be found floating around these days.").

The consolidation of power accompanying the rise of the administrative state has not gone unnoticed. Nor has this trend, which threatens to undo the Founders' deliberate weaving of separation of powers into the fabric of our government, been without its detractors. *See, e.g.*, *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 135 S. Ct. 1225, 1254–55 (2015) (Thomas, J., concurring in judgment) (acknowledging that by failing to enforce the separation of powers mandated by the Constitution, the Court was complicit in the concentration of power "in the hands of a vast and unaccountable administrative apparatus"). In a dissenting opinion critical of courts' overly deferential treatment of administrative agencies, Chief Justice Roberts channeled James Madison, who "famously wrote that the accumulation of all powers, legislative, executive, and judiciary, in the same hands, . . . may justly be pronounced the very definition of tyranny." *City of Arlington*, 133 S. Ct. at 1877 (Roberts, C.J., dissenting) (ellipsis in original) (citation and internal quotation marks omitted); *accord Ass'n of Am. R.Rs.*, 135 S. Ct. at 1244 (Thomas, J., concurring in judgment) (recognizing the text of the Federal Constitution, as well as the debates and writings surrounding its enactment, "reflect a conviction that the power to make the law and the power to enforce it must be kept separate, particularly with respect to the regulation of private conduct"). The Chief Justice went on to acknowledge the public perception of administrative agencies as faceless bureaucracies, admitting that

> the citizen confronting thousands of pages of regulations—promulgated by an agency directed by Congress to regulate, say, "in the public interest"—can perhaps be excused for thinking that it is the agency really doing the legislating. And with hundreds of federal agencies poking into every nook and cranny of daily life, that citizen might also understandably question whether Presidential oversight—a critical part of the Constitutional plan—is always an effective safeguard against agency overreaching.

*City of Arlington*, 133 S. Ct. at 1879 (Roberts, C.J., dissenting). This observation echoed concerns expressed by Professor Charles A. Reich, who has described "the growth of the administrative, bureaucratic state" as

> the greatest single threat to the survival of the Framers' Constitution. Their tripartite scheme of legislative, executive, and judicial branches

has been altered almost beyond recognition by the dominance of a Fourth Branch of government which combines in itself powers of each original branch and engages in detailed management rather than traditional limited government.

Charles A. Reich, *The Individual Sector*, 100 Yale L.J. 1409, 1430–31 (1991).

This threat is far from theoretical, of concern only to judges and academics. One need look no further than the Tenth Circuit's recent decision in *Caring Hearts* for an example of the dangers posed by an unchecked administrative state. Caring Hearts, a provider of home nursing and physical therapy services, engaged in a lengthy—and until recently, futile—battle with the Centers for Medicare and Medicaid Services (CMS), an administrative agency within the U.S. Department of Health and Human Services, over the legality of payments Caring Hearts received for services provided to Medicare participants in 2008. *See Caring Hearts*, 2016 WL 3064870, at *1–2. Caring Hearts was ultimately successful because, as the Tenth Circuit noted, the regulations upon which CMS relied did not exist when the contested services were rendered. *Id.* at *2. Not only that, but the regulations that *did* exist at the relevant times supported Caring Hearts's position, not CMS's. *See id.* at *2–6. However, until the Tenth Circuit's decision, CMS had successfully convinced every administrative and judicial tribunal the agency appeared before that Caring Hearts knowingly engaged in unlawful conduct by violating "regulations that were [at the time the conduct occurred] but figments of the rulemakers' imagination, still years away from adoption." *Id.* at *2.

The dispute between Caring Hearts and CMS began when, after an audit, CMS determined the government paid Caring Hearts approximately $800,000 for services that were not compensable under federal law, leading CMS to demand that Caring Hearts refund the payments. *Id.* at *1 (citing 42 U.S.C. §§ 1395f(a), 1395y(a)(1)(A)). Caring Hearts appealed CMS's decision, correctly contending that CMS was relying on regulations that did not exist when Caring Hearts provided the services in 2008. *See id.* at *2. Yet, at every step up the administrative ladder, CMS prevailed, with bureaucrats, an administrative law judge, and even a federal district judge all accepting CMS's claim that Caring Hearts had violated properly promulgated regulations. *See id.* at *2–6; *see also Caring Hearts Pers. Home Servs., Inc. v. Sebelius*, No. 12-2700-CM, 2014 WL 4259151, at *1–2 (D. Kan. Aug. 28, 2014) (citations omitted) (describing Caring Hearts's journey through the administrative appeals process), *vacated sub nom. Caring Hearts Pers. Home Servs., Inc. v. Burwell*, No. 14-3243, 2016 WL

3064870 (10th Cir. May 31, 2016). Given the long-established principle "that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer,"[6] it is not surprising CMS was repeatedly successful in defending its actions, even when they were subjected to judicial scrutiny. *See Caring Hearts*, 2014 WL 4259151, at *2–3, *8, *14–16 (finding substantial evidence supported the agency's determination that the contested services were non-compensable). CMS's winning streak may not have ended but for the minor detail, mentioned above, that the regulations CMS contended Caring Hearts knowingly violated *did not exist* when Caring Hearts supposedly violated them. *Caring Hearts*, 2016 WL 3064870, at *2.

In rejecting CMS's bold attempt to enforce nonexistent regulations, the Tenth Circuit stated what should have been, but apparently was not, obvious when it observed that "surely one thing no agency can do is apply the wrong law to citizens who come before it, especially when the right law would appear to support the citizen and not the agency." *Id.* at *2. In its conclusion, the court again touched on the dangers posed by a single governmental body being allowed to write, enforce, and interpret the law: "[A]n agency decision," the court said, "that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens can never stand." *Id.* at *7. Therefore, although Caring Hearts ultimately prevailed, it did so only after litigating the issue to the second-highest federal court in the United States.[7] The fact that Caring Hearts had to go to such extraordinary lengths to challenge the agency's fiat demonstrates the wisdom of the Founders' division of power among three co-equal branches of government, and it is with this background in mind that I consider the present case.

---

[6] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984); *accord Kiawah Dev. Partners, II v. S.C. Dep't of Health & Envtl. Control*, 411 S.C. 16, 34, 766 S.E.2d 707, 718 (2014) ("[O]ur deference doctrine provides that courts defer to an administrative agency's interpretations with respect to the statutes entrusted to its administration or its own regulations 'unless there is a compelling reason to differ.'" (quoting *S.C. Coastal Conservation League v. S.C. Dep't of Health & Envtl. Control*, 363 S.C. 67, 75, 610 S.E.2d 482, 486 (2005))).

[7] The Tenth Circuit hinted that, on remand, CMS should concede its position was not "substantially justified," thus allowing Caring Hearts to recover some of its litigation expenses from the government. *Caring Hearts*, 2016 WL 3064870, at *7 (citation omitted).

## II.

In South Carolina, to preserve some semblance of the separation of powers we once held sacred, an administrative agency may not make law without legislative oversight and approval. This legislative accountability is accomplished through the APA, which requires, with some exceptions not applicable here, the submission of proposed regulations to the General Assembly. *See* S.C. Code Ann. § 1-23-120 (Supp. 2015). If the General Assembly does not act to disapprove an agency's proposed regulation within a certain period of time, the regulation becomes effective. *Id.* § 1-23-120(D).

The question then becomes, "What constitutes a regulation, such that an agency must comply with the APA?" That question was correctly answered by the dissent in *Sloan*, which recognized that an agency creates a regulation requiring APA compliance, as opposed to "a general policy statement," which does not, when the agency's action "establishes a binding norm." *Sloan*, 370 S.C. at 491, 636 S.E.2d at 618 (Toal, C.J., dissenting) (quoting *Home Health Serv., Inc. v. S.C. Tax Comm'n*, 312 S.C. 324, 328, 440 S.E.2d 375, 378 (1994)) (internal quotation marks omitted); *see also* S.C. Code Ann. § 1-23-10(4) (2005) (defining a regulation, in part, as "each agency statement of general public applicability that implements or prescribes law or policy or practice requirements of any agency").

> The key inquiry, therefore, is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion. As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm.

*Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir.1983), *quoted in Sloan*, 370 S.C. at 491, 636 S.E.2d at 618 (Toal, C.J., dissenting). In addition, "when there is a close question whether a pronouncement is a policy statement or regulation, the [agency] should promulgate the ruling as a regulation in compliance with the APA." *Home Health Serv., Inc.,* 312 S.C. at 329, 440 S.E.2d at 378.

Turning to the facts of this case, which Justice Toal ably recounts in the Court's opinion, it is clear the Board, in adopting the 2011 position statement interpreting the Statute, "promulgated an invalid regulation because [it] failed to comply with the rule-making provisions of the APA." *Sloan*, 370 S.C. at 491, 636 S.E.2d at 619 (Toal, C.J., dissenting). The 2011 position statement declaring intra-practice referrals among physical therapists lawful, like its 2004 predecessor declaring similar referrals between physicians and physical therapists unlawful, gives the Board no discretion to consider the facts of a particular case before it—once facts are established satisfying the position statement's criteria, the Board's hands are tied—making the position statement a quintessential regulation. *See Ryder Truck Lines, Inc.*, 716 F.2d at 1377 (noting the lack of agency discretion is the hallmark of a regulation).

In finding the 2004 position statement did not amount to a regulation, the majority in *Sloan* incorrectly held that the Statute itself "prohibit[s] a physical therapist from working as an employee of a physician when the physician refers patients to the physical therapist for services." *Sloan*, 370 S.C. at 473, 636 S.E.2d at 609. Perhaps the General Assembly would have approved a regulation promulgated by the Board to proscribe that conduct, but the language of the Statute makes it clear the legislature also could have rejected such a regulation. Section 40-45-110 provides that the Board *may* take action against a licensed physical therapist who

> requests, receives, participates, or engages directly or indirectly in the dividing, transferring, assigning, rebating, or refunding of fees received for professional services or profits by means of a credit or other valuable consideration including, but not limited to, wages, an unearned commission, discount, or gratuity with a person who referred a patient, or with a relative or business associate of the referring person.

S.C. Code Ann. § 40-45-110(A)(1) (2011).

The point is that the General Assembly, by inserting the discretionary term "may," was looking to the Board to determine, through the regulatory process, the parameters of section 40-45-110. *Compare Collins v. Doe*, 352 S.C. 462, 470, 574 S.E.2d 739, 743 (2002) ("Under the rules of statutory interpretation, use of words such as 'shall' or 'must' indicates the legislature's intent to enact a mandatory requirement."), *with State v. Hill*, 314 S.C. 330, 332, 444 S.E.2d 255, 256 (1994) ("The word 'may' ordinarily signifies permission and generally means the action

spoken of is optional or discretionary." (quoting *Robertson v. State*, 276 S.C. 356, 358, 278 S.E.2d 770, 771 (1981)) (internal quotation marks omitted)).  Indeed, ignoring the Statute's discretionary language, as the *Sloan* majority did,[8] the Statute is broad enough to prohibit the conduct deemed permissible in the 2011 position statement—physical therapists working for and receiving referrals from other physical therapists—for on its face the Statute makes no distinction between referrals from (or employment by) physicians and referrals from (or employment by) other physical therapists.  *Cf. Sloan*, 370 S.C. at 474–75, 636 S.E.2d at 610 (finding that the Board's 2004 position statement "did not implement or prescribe the law or practice requirements for physical therapists in more detail than set forth by statute").  I would not permit the Board to make these important policy decisions through the use of mere position statements; instead, I would insist on strict compliance with the APA.[9]

The possible ramifications of violating the Board's position statement further convince me of the necessity of requiring strict APA compliance.  In addition to

---

[8] This same fundamental error affected the Attorney General opinion cited in *Sloan*, upon which the Board relied in issuing the 2004 position statement.  *See Sloan*, 370 S.C. at 465, 636 S.E.2d at 605 (citing S.C. Code Ann. § 40-45-110(A)(1); S.C. Att'y Gen. Op. dated March 30, 2004, 2004 WL 736934).  The Attorney General opinion ignored the Statute's use of "may" and the corresponding need for the Board to promulgate regulations determining the proper scope of section 40-45-110.  *See* S.C. Att'y Gen. Op., 2004 WL 736934, at *1–2, 5.  The Attorney General opinion therefore neglected to consider that the Statute was part of a legislative delegation of authority designed to implement a statutory scheme in conformity with the APA.  Instead, the Attorney General opinion erroneously construed the Statute as mandating a particular result and took it upon itself to determine what conduct the Statute proscribed.  *Id.* at *2.

[9] I hasten to add that such strict compliance is not necessary where an administrative agency is acting pursuant to valid federal regulations mandating a different procedure.  *See, e.g., Stogsdill v. S.C. Dep't of Health & Human Servs.*, 410 S.C. 273, 280, 763 S.E.2d 638, 642 (Ct. App. 2014) (holding that in the context of Medicaid waivers, once the State's waiver application is approved by CMS, the waiver's terms carry the force and effect of federal law and need not be promulgated as regulations pursuant to the APA), *cert. dismissed*, 415 S.C. 242, 781 S.E.2d 719 (2016).

license revocation, the Board may impose civil penalties up to $10,000 for violations of the Statute. S.C. Code Ann. §§ 40-45-110(A), -120 (2011). Moreover, a violation of the Statute subjects the offender to potential criminal penalties, including imprisonment for up to ninety days. *Id.* § 40-45-200 (2011). Given that severe penalties, including criminal prosecution, are associated with a statutory violation, I would strictly construe the legislature's grant of authority to the Board.[10] Doing so, it is clear the General Assembly envisioned it would have the opportunity to review specific regulations before they became effective.

Of course, where the General Assembly hits the proverbial bulls-eye and assigns enforcement of a statute to an administrative agency with the command of "shall," then the agency shall act accordingly, free from the duplicative effort of formally promulgating a regulation.[11] *See Collins*, 352 S.C. at 470, 574 S.E.2d at 743. But that is far from the situation here. The Board may not, in my firm judgment, determine where to draw the line between legal and illegal conduct under the guise of issuing a "policy statement" that avoids the rigors and transparency of an APA-approved regulation.[12] Because *Sloan* has permitted the Board and the State's other

---

[10] *Cf. Nelson v. Ozmint*, 390 S.C. 432, 436, 702 S.E.2d 369, 371 (2010) (noting the rule of statutory construction that penal statutes are strictly construed against the State (citing *State v. Blackmon*, 304 S.C. 270, 273, 403 S.E.2d 660, 662 (1991))).

[11] The majority in *Sloan* expressed concern over this potential redundancy, stating that to require compliance with the APA "would lead to the absurd result that, before an agency may enforce a statute, it would have to enact a regulation explaining its interpretation and application of the statute in detail and its intention of enforcing it." *Sloan*, 370 S.C. at 475, 636 S.E.2d at 610. However, the *Sloan* majority, the Board, and the Attorney General opinion on which the Board relied misinterpreted the Statute. Nowhere does the Statute *require* the Board to do anything. As noted, the Statute speaks only in permissive terms, in anticipation of agency-crafted regulations promulgated pursuant to the APA. Thus, the *Sloan* majority's concern was misplaced.

[12] In addition to requiring proposed regulations be submitted to the General Assembly, the APA also "generally requires a state agency to give notice of a drafting period during which public comments are accepted on a proposed regulation; conduct a public hearing on the proposed regulation overseen by an administrative law judge or an agency's governing board; [and] possibly prepare reports about the [proposed] regulation's impact on the economy, environment, and

administrative agencies to do just that, it must be overruled.

## III.

The ever increasing reach of the so-called Fourth Branch of government presents a threat to our civil society, especially the principle of separation of powers. If the executive branch, through unelected bureaucrats and seemingly countless administrative agencies, is going to set policies having the force of law, the judicial branch must insist on clear delegation from the legislative branch and strict compliance with the APA, including submission of administrative policies having the force and effect of law to the legislature for review.

In sum, I would accord Appellants standing, declare the 2011 position statement unlawful, and overrule *Sloan*. I concur with the majority in result.

---

public health." *Sloan*, 370 S.C. at 474, 636 S.E.2d at 609–10.

**JUSTICE BEATTY:**  While the majority's decision is laudable, I do not believe Appellants have standing to challenge the 2011 Position Statement.  Thus, I would affirm the circuit court's order pursuant to Rule 220(c) of the South Carolina Appellate Court Rules.[13]

Although Appellants raise nine arguments, they can be consolidated into two categories:  (1) the propriety of this Court's decision in *Sloan*, and (2) the procedural and substantive implications of the Board's 2011 Position Statement. However, before addressing the merits of this appeal, I believe an initial determination must be made as to whether Appellants have standing to challenge the 2011 Position Statement and, in turn, petition for this Court to reconsider its decision in *Sloan*.

"Before any action can be maintained, a justiciable controversy must be present."  *Sloan v. Greenville Cnty.*, 356 S.C. 531, 546, 590 S.E.2d 338, 346 (Ct. App. 2003).  "A justiciable controversy is a real and substantial controversy appropriate for judicial determination, as opposed to a dispute or difference of a contingent, hypothetical or abstract character."  *Id.*  "The concept of justiciability encompasses the doctrines of ripeness, mootness, and standing."  *Id.* at 547, 590 S.E.2d at 546.

A plaintiff must have standing to institute an action.  *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 639, 528 S.E.2d 647, 649 (1999).  "To have standing, one must have a personal stake in the subject matter of the lawsuit."  *Sea Pines Ass'n for the Prot. of Wildlife, Inc. v. S.C. Dep't of Natural Res. & Cmty. Servs. Assocs.*, 345 S.C. 594, 600, 550 S.E.2d 287, 291 (2001).  In other words, one must be a real party in interest.  *Glaze v. Grooms*, 324 S.C. 249, 255, 478 S.E.2d 841, 845 (1996).  "A real party in interest is one who has a real, material, or substantial interest in the subject matter of the action, as opposed to one who has only a nominal or technical interest in the action."  *Charleston Cnty. Sch. Dist. v. Charleston Cnty. Election Comm'n*, 336 S.C. 174, 181, 519 S.E.2d 567, 571 (1999) (quoting *Anchor Point Inc. v. Shoals Sewer Co.*, 308 S.C. 422, 428, 418 S.E.2d 546, 549 (1992)).  "Additionally, a private person may not invoke the judicial power to determine the validity of executive or legislative action unless he has sustained, or is in immediate danger of sustaining, prejudice therefrom."  *Evins v. Richland Cnty. Historic Pres. Comm'n*, 341 S.C. 15, 21, 532 S.E.2d 876, 879

---

[13]  Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal.").

(2000). "However, a court may confer standing upon a party when an issue is of such public importance as to require its resolution for future guidance." *Baird v. Charleston Cnty.*, 333 S.C. 519, 531, 511 S.E.2d 69, 75 (1999).

A party seeking to establish standing must prove the "irreducible constitutional minimum of standing," which consists of three elements: (1) the plaintiff must have suffered an injury in fact; (2) the injury and the conduct complained of must be causally connected; and (3) it must be likely, rather than merely speculative, that the injury will be redressed by a favorable decision. *Sea Pines Ass'n for the Prot. of Wildlife, Inc.*, 345 S.C. at 601, 550 S.E.2d at 291 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992)).

Cognizant of the above-outlined principles, I begin with an examination of the reason Appellants instituted the declaratory judgment action. As expressed in the jurisdictional statement of their pleadings, Appellants invoked the judicial power of the circuit court to "determine that the 2011 Position Statement adopted August 17, 2011, by the Board regarding the 'Application of 40-45-110(A)(1) to Intra-Professional Interactions' violates the provisions of the PT Act and the Constitutions of South Carolina and the United States." Thus, any basis to confer standing upon Appellants emanates from a dispute regarding the validity of the 2011 Position Statement and not, as the majority holds, from a desire to challenge *Sloan*. Unlike the majority, I believe a determination regarding standing must be strictly limited to an assessment of the 2011 Position Statement.[14] I would find Appellants have failed to prove the requisite elements to establish standing.

---

[14] Interestingly, the more lenient stance enunciated by the members of the majority opinion is a marked departure from decisions they authored that strictly required those seeking standing to identify a concrete, particularized harm to a legally protected interest. *See Sea Pines Ass'n for the Prot. of Wildlife, Inc. v. S.C. Dep't of Natural Res. & Cmty. Servs. Assocs.*, 345 S.C. 594, 550 S.E.2d 287 (2001) (concluding Appellants, who were comprised of wildlife organizations, did not have standing to challenge the decision by the Department of Natural Resources to issue permits to lethally reduce deer population in wildlife sanctuary because they failed to allege a particularized harm); *see also Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 407 S.C. 67, 753 S.E.2d 846 (2014) (holding that objectors, who alleged nuisance and zoning claims against cruise ship operations, lacked standing as they failed to allege a concrete, particularized harm to a legally protected interest); *ATC South, Inc. v. Charleston Cnty.*, 380 S.C. 191, 669 S.E.2d 337 (2008) (ruling that competitor business, which sought to challenge

First, none of the Appellants have suffered or will suffer an injury that is attributable to the 2011 Position Statement. Without dispute, Drs. Joseph and McCarthy are not subject to the 2011 Position Statement because they are orthopedic surgeons and not PTs. Moreover, PT Joseph will not be punished or disciplined as a result of the 2011 Position Statement. In fact, she will actually benefit from the Board's position as she can continue to work in a group physical therapy practice where, by her own admission, she treats patients sent to her by other PTs in the group. Additionally, Appellants do not object to PTs in a group practice covering for other PTs nor do they seek to prevent this practice. Second, the injury alleged by Appellants is causally related to the 2004 Position Statement addressed in *Sloan* and not the 2011 Position Statement. Notably, Dr. McCarthy testified they were seeking for the court "[t]o grant us the ability to employ [PTs] again, like we did in past," i.e., pre-*Sloan* operations. Third, even if the Court were to declare the 2011 Position Statement void and prohibit PTs from covering for other PTs, such a favorable decision provides no discernible relief to Appellants.

Based on the foregoing, I would find that Appellants have not established standing to challenge the 2011 Position Statement. Moreover, this case does not present a question of public importance that would serve as a basis to confer standing upon Appellants. Any question of public importance was decided by the Court in *Sloan*. Because Appellants lack standing to institute a challenge to the 2011 Position Statement, I would affirm the circuit court's order dismissing Appellants' claims under Rule 220(c), SCACR.

Finally, I emphasize that all legislative attempts to overturn *Sloan* have failed. Thus, even if Appellants had standing to challenge our decision in *Sloan*, a decision to overrule *Sloan* would be contrary to the clear intent of the Legislature as section 40-45-110(A)(1) has been in effect since 1998 and has not been amended even after this Court's decision in *Sloan*. If the Legislature believes this Court's interpretation in *Sloan* is in error, it is free to correct any misinterpretation. The Legislature's failure to do so in ten years is evidence that it agrees with this Court's interpretation of section 40-45-110(A)(1). *See McLeod v. Starnes*, 396 S.C. 647, 660, 723 S.E.2d 198, 205 (2012) ("The Legislature is presumed to be aware of this Court's interpretation of its statutes." (citation omitted)); *Wigfall v. Tideland Utils., Inc.*, 354 S.C. 100, 111, 580 S.E.2d 100, 105 (2003) (recognizing

---

rezoning to a classification that would permit a cell-phone tower, lacked standing where the potential injury or prejudice alleged was only an increase in business competition).

that when the Legislature fails to alter a statute, "its inaction is evidence the Legislature agrees with this Court's interpretation" of the statute); *State v. One Coin-Operated Video Game Mach.*, 321 S.C. 176, 181, 467 S.E.2d 443, 446 (1996) ("Moreover, our adherence to *stare decisis* in this case does not implicate the risk of the 'petrifying rigidity' in the law that can result from too firm an adherence to the doctrine. Because we are adhering to our earlier interpretation of a *statute,* the General Assembly is free to correct any misinterpretation on our part.").

Unlike the majority, I would hold that Appellants lack standing to institute a challenge to the 2011 Position Statement and, in turn, to petition this Court to overrule *Sloan*. In the absence of this fundamental prerequisite, I would affirm the circuit court's order dismissing Appellants' claims.

**PLEICONES, C.J., concurs.**